From his conviction of capital murder in the Circuit Court of Jackson County and the imposition of the sentence of death, Jimmy Lee Gray has appealed here. The indictment upon which Gray was tried charged him with the capital murder of one Deressa Jean Scales, in that the victim, a three-year old girl, had been kidnapped by Gray and killed by him in the course of the kidnapping. Mississippi Code Annotated section 97-3-19(2)(e) (1972). The trial which resulted in the present appeal was conducted in two stages, in conformity with Jackson v. State,337 So.2d 1242 (Miss. 1976), Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) and Furman v. Georgia,408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).
This is the second appearance of this case in this Court, Gray's first conviction having been reversed and the case remanded for retrial for reasons stated in this Court's opinion, reported as Gray v. State, 351 So.2d 1342 (Miss. 1977).
Following a verdict of guilty in the most recent or second trial, a hearing was had as to the punishment to be imposed upon Gray, at which evidence touching aggravating and mitigating circumstances was submitted to the jury under instructions of the *Page 996 
court. The jury returned a unanimous verdict finding that the mitigating circumstances were outweighed by the aggravating circumstances and that the death penalty should be imposed.
On the guilt phase, the evidence supporting the jury's verdict may be summarized as follows:
The victim of the homicide was Deressa Jean Scales, three year old daughter of Richard and Deborah Scales. The father was a millwright, the mother a housewife. This family resided at Captain Grant Apartments in Pascagoula, where Gray, the appellant, also resided, occupying an apartment with his "girlfriend."
On June 25, 1976, the day began normally for the Scales family. Scales had gone to work as usual and Mrs. Scales was about her household duties. About 4:30 in the afternoon, Mrs. Scales sent Deressa out to play, with instructions to return in ten minutes. When Deressa failed to return, Mrs. Scales went out looking for her; however, Deressa could not be found and Mrs. Scales called the police. All of the apartments were checked with the exception of that of appellant Gray, Gray not having been there at the time. Gray returned later on and Deressa was looked for in his apartment, which was found to be empty, but in which a wet pair of blue jeans was observed in a corner of the bedroom. Deressa was still missing at 8:00 that evening. When Scales had asked Gray if he had seen Deressa, Gray replied that he had not. Deressa had been accustomed to playing with Gray's cats and Mrs. Scales thought that he might know something which would help in discovering her whereabouts. Deressa was not seen again by her mother or father until the morning of June 26th, when her body was identified.
The search for Deressa was continued throughout the night by the police and her parents. Gray was thought to have been the last person to have seen her before her disappearance. The police found him at the Colonel Dixie Hamburger place on Highway 90, where his "live-in" girlfriend worked. He was asked to accompany the officers to the complex for the purpose of pointing out to them where he had last seen Deressa. En route, it was decided that a statement should be taken from Gray and, after giving him the Miranda warnings, he was taken to the police station. While driving to the station, or when they arrived at the station, the exact moment being unclear, the police submitted information on Gray through the National Crime Information Center computer system and received a reply reflecting a "hit", indicating that Gray was wanted for some criminal offense. This information (which later turned out to be incorrect) was received at approximately 1:00 a.m. on the morning of June 26. A further statement of the Miranda warnings was given to Gray, but a brief preliminary interrogation provided to be unfruitful. However, as the officers and Gray were ascending in the elevator, Gray spontaneously said, "If I take you to her will you help me?" No offer of help was made to Gray but he offered to take the officers to where he had left Deressa. Needless to say, this offer was accepted and Gray and the officers entered an automobile to be directed by Gray to the place where he had left the child.
Following Gray's directions the men proceeded, not without some difficulty, until they reached a bridge over Black Creek on a remote and little-traveled road, some 25 or 30 miles from the apartment complex from which Gray had taken Deressa. At this point Gray said to the officers, pointing to the north rail of the bridge "Right here is where she went over." He told them that the child had slipped off the bridge while climbing on the rail. The officers immediately requested via radio that the sheriff's "flotilla" be dispatched to the scene. After some hour and a half a boat and diver (the water was approximately 20 feet deep), arrived. The body was discovered, however, by a bystander who had a powerful spotlight on his automobile at about 4:30 in the morning. The light had revealed the red clothing worn by the child whose body was about 30 yards south of the bridge. *Page 997 
After recovery of the body, Gray was returned to the police station. After he was again given the Miranda warnings Gray gave a statement, which he did not sign, to the effect that the child had been alive when she fell from the bridge. That afternoon, Gray gave a second statement. This statement was taped, transcribed and signed by Gray, after he had made certain corrections. There is no contention that this statement was the result or product of any kind of coercion or improper promises or inducements. The account now given by Gray was as follows:
B: Jimmy, if you would, tell me in your own words, what happened past date, which would have been the 25th day of June, 1976, Friday, in reference to you picking up this little girl, Deresa.
J. Sue and I arrived from New Orleans about 4:30 and Deresa was out there to greet us and followed us up to the apartment, where I told her that I had to take Sue to work and that I did not have time to play. She knocked on the door a while, while we were getting ready and we left and I told her I would be right back. She said Okay. So, I drove Sue to work and I stayed there for a little bit, I don't know how long. I drove back to the apartment and Deresa was out there. She came running up and said she wanted to play with the cats. I asked her which cat she would like and she said, "Jaws". Then, she decided she wanted Suki. She played with the cats on the lawn. She was playing with a golf ball. She got into throwing the golf ball into the water so these three black guys could dive in after it for her. I had to do some work on the car, so I took the cats back up stairs. She followed me around to the car. I had the door opened. I had to open the door to unlatch the hood. I left the door open and I opened the hood and I opened the trunk. Meanwhile, Deresa climbed into the car and she is playing with the steering wheel. I did not tell her to get out of the car. She wanted to ride. So, I thought we would go for a little ride after I got the car fixed. I was working on the car for a while. I left the door opened, I closed the trunk and I closed the hood, then I went upstairs, leaving Deresa in the car. I locked up the house. I returned to the car, I got in and drove towards Moss Point.
I crossed this big bridge there and was just looking at some of the country. Then, I got to thinking, I might should not have taken Deresa because I might get into some kind of trouble. Anyway, the more I drove, the more worried I got, the more sure I was that I was going to get into trouble. So, I couldn't figure out what to do. I made a few turns, going down some roads and ended up on ah . . . there is a little side road that we followed a little ways, there is a little ditch there and we stopped the car. (Note: There is a brief pause) We stopped the car, and ah . . like, we had not gone out there . . I had not gone out there to molest her or do anything like that. I did not take her clothes off or anything. She stayed in the front seat and we just kind of talked a little bit.
B: Did you molest her at that point Jimmy?
J: I really did not do much to her, you know, I may have touched her, but I did not touch her with my penis or anything like that. I didn't stick my finger way up in there or anything, you know, I just . .
B: Did you play with her vaginal area with your hands?
J: Yea, I touched that area.
B: What about the anal area?
J: No.
B: You did not touch it? J: No.
J: Like I said, I did not undress her, my intention was not to do that I did not go out there to do that sort of thing. I did not go out there to do anything. I just wanted to ride around and look at some of the country side. Like, we headed upon this little road here and we got out and started to walk across this ditch and she fell into the ditch. But, she must have hit wrong or something, you know, I guess she must have gasped or took a breath at the same time she hit the water, or whatever it was, anyway, she did not come up right away. She sort of coughed, I guess. *Page 998 
B: How long did she lay there in the water?
J: She was in the water (pause) she was in the water, well a lot less than a minute. I don't know really how long it had been. It was a lot less than a minute. I picked her up and put her in the trunk of the car, she was still breathing, she was still alive. She was wet and muddy and everything. You know, I started driving back towards the way we came, only on another road. We crossed this bridge and I stopped on the middle of the bridge and threw her over. Then I went down . . . then I backed the car up and I went down to see if I could find her, but I could not find her. The current had swept her away or had done something, because I did not know where she had gone.
B: Then, what did you do?
J: Well, I drove . . ., I started to drive away and I went back again and I looked around some more and I still didn't see her, so I left and went back to Pascagoula.
B: When you got to Pascagoula, where did you go?
J: I stopped at Colonel Dixie.
B: About how long were you there?
J: I am not sure exactly. I don't know, it could have been anywhere from 10 to 15 minutes. I don't know. Then, I went to the car wash after that, over on Chico Road and washed the car, then I went home.
B: This road you drove off in, where you are talking about when she fell in the ditch, is this the road, the first road east of the road where the bridge is, where you threw her off the bridge?
J: I think so. I am not certain.
B: This map you showed me indicates that road you are talking about, this diagram that you drew me. By that diagram, this would be the first road east of the one that the bridge is on.
J: Okay.
B: If you are going down towards the bridge off the main road, you keep going, that road turns and comes back up to another road, is that correct?
J: Yes
BIGGS: Then, you take a left on your first little road and that's the point . .
J: That's not really much of a road.
B: This is the point where you stopped and molested her?
J: Well, that's when we stopped and that's where everything happened.
The "ditch" into which Gray said in his statement that Deressa had fallen, was shown to have been three feet wide and to have contained only three inches of water over two inches of soft silt.
Dr. Cooper, a pathologist, testified that he had performed the autopsy on the child's body. He found numerous bruises and scratches about her head, face and shoulders. None of these was sufficient to cause death or unconsciousness. It was established that she had no such injuries when she had left her apartment on the previous day. Dr. Cooper found the child's hymenal ring bruised, but not broken, and there was a small amount of blood in the area. The anal canal was dilated "wide open," and in the doctor's opinion, the significance of this dilation was that shortly before or immediately after the death had occurred, "something had dilated it." Specimens taken from the oral, vaginal and anal orifices were taken and forwarded to the Federal Bureau of Investigation. Internal examination revealed that the cause of death had been inhalation of a muddy material, which was found to be present from the mouth, down the windpipe, and into the small air sacs of the lungs. The lungs themselves contained air which indicated that the child had not drowned.
An FBI agent, who qualified as an expert, testified that the vaginal, oral and anal swabbings were chemically tested by him to determine whether semen was present. Tests on the oral and vaginal swabbings were negative. The anal swabbings, however, contained both "enzynie acid phospatase" and "choline", two chemicals found in high concentration in semen. He was not able to identify the presence of a "cell or spermatozan." *Page 999 
The appellant, Gray, did not testify on the trial of the guilt phase.
The jury, having received the instructions of the court and heard argument of counsel, retired and presently returned their verdict finding Gray guilty of capital murder. A poll was conducted showing the verdict to have been unanimous.
It is the conclusion of this Court that the evidence, with the reasonable inferences which the jury was justified in drawing from it, was sufficient to support a finding by the jury that Gray had abducted the child and had driven her twenty-five or thirty miles on an old logging road and there had killed her, either to silence the child's outcries or to keep her from reporting what he had done to her.
The questions assigned as error by appellant may be distinguished as those which relate to the trial of the issue of guilt and those which relate to the procedure fixing the punishment.
 ASSIGNMENTS OF ERROR RELATING TO THE TRIAL OF THE GUILT ISSUE I. THE TRIAL COURT DID NOT ERR IN DENYING MOTION TO PERMIT VOIR DIRE OF JURORS IN JURY BOX.
Several months prior to the trial a motion had been made in the appellant's behalf by his then counsel, styled "Motion For Sufficient Voir Dire." A similar motion was made orally by present counsel and, prior to conducting the voir dire of the jury, was heard on the day of the trial. The court was asked to allow counsel to voir dire prospective jurors in the "jury box." Counsel argued that the procedure which had been followed for years and known as the "Stennis" method would not protect the rights of the accused as fully as the suggested alternative. Two local attorneys were called as witnesses to testify that, in their opinion, a voir dire of prospective jurors in the jury box would be more likely to obtain full and fair answers to questions than would be the case if they were "voir dired" as a panel. The motion was denied by the trial court and this action is assigned as reversible error. The Court had said:
 BY THE COURT: I will allow the voir dire examination to be a fair and impartial one. The Supreme Court has sustained the Stennis method, but I will assure you of a fair and impartial voir dire examination of the Jury under the Stennis System. I am going to use the Stennis System.
There is no assertion by appellant that, in the event, the jury selected in the case was not fair and impartial. Nothing was shown and nothing is asserted to indicate that any prospective juror failed to respond truthfully and frankly to the questions addressed to the panel. Nor is it shown that any juror concealed information by failing to respond to any question. Nor is it shown, or even asserted, that any of the jurors who were actually accepted and served concealed or misrepresented some disqualifying fact by failure to answer fully and correctly the questions of counsel because of the method of voir dire or for any other reason.
The so-called Stennis method of jury selection is in use in Mississippi and has been for many years. Both state and federal courts follow the rule that the trial court has broad discretion in conducting voir dire. U.S. v. Harper, 505 F.2d 924 (5th Cir. 1974), Peters v. State, 314 So.2d 724 (Miss. 1975), certiorari denied, 423 U.S. 1019, 96 S.Ct. 457, 46 L.Ed.2d 392 (1975),Bright v. State, 293 So.2d 818 (Miss. 1974).
Mississippi Uniform Criminal Rules of Circuit Court Practice 5.02 (1977), formerly Rule 13 of the Uniform Rules of Circuit Court, provides:
 In the voir dire examination of jurors, the attorney shall direct to the entire venire questions only on matters not inquired into by the court. Individual jurors may be examined only when proper to inquire as to answers given or for other good cause allowed by the court. No hypothetical questions requiring any juror to pledge a particular verdict will be asked.
In Peters v. State, 314 So.2d 724, 728 (Miss. 1975), it was said: *Page 1000 
 We find no fault with Circuit Court Rule 13 requiring general questions to be directed to the entire group of jurors presented, so long as the defendant is given a fair opportunity to ask questions of individual jurors which may enable the defendant to determine his right to challenge a juror.
Moreover, in the present case the record clearly reflects that, of twenty pages of voir dire conducted by defense counsel, individual responses appear on seventeen pages, comprising thirty-five individual responses. Counsel for appellant was not restricted or limited in his questioning of prospective jurors and was permitted to ask every question that he desired. It has not been demonstrated that appellant suffered any prejudice through the use of the Stennis method rather than the jury box method. The trial court did not abuse its discretion in denying the motion.
 II. IT WAS NOT ERROR TO ADMIT EVIDENCE OF PATHOLOGIST.
It is contended by appellant that it was error to admit into evidence the testimony of Dr. Cooper, the pathologist, because it created an "inference of sodomy and child molestation." Appellant's argument is that it placed him in the position of having to defend a multiplicity of charges and that the evidence improperly introduced sodomy into the case but failed to substantiate the charge. In connection with this assignment, it is argued that photographs of the child's body showing the injuries and its condition had no probative value and were prejudicially inflammatory. These photographs were dealt with by the pathologist who testified as to their significance.
In dealing with Gray's first appeal, it was stated in this Court's opinion:
 It is well settled in this state that proof of a crime distinct from that alleged in an indictment is not admissible against an accused. There are certain recognized exceptions to the rule. Proof of another crime is admissible where the offense charged and that offered to be proved are so connected as to constitute one transaction, where it is necessary to identify the defendant, where it is material to prove motive and there is an apparent relation or connection between the act proposed to be proved and that charged, where the accusation involves a series of criminal acts which must be proved to make out the offense, or where it is necessary to prove scienter or guilty knowledge. See, Smith v. State, 223 So.2d 657 (Miss. 1969), cert. denied, 397 U.S. 1030, 90 S.Ct. 1274, 25 L.Ed.2d 542 (1970); Cummings v. State, 219 So.2d 673 (Miss. 1969), cert. den. 397 U.S. 942, 90 S.Ct. 954, 25 L.Ed.2d 122 (1970). . . .
 (351 So.2d at p. 1345).
There is no suggestion that Gray kidnapped the Scales child for ransom. Proof of the child's injuries and condition reasonably tend to support the conclusion that his motive was sexually related and that the killing of the child was to suppress her outcries or to prevent her reporting what he had done to her. Moreover, the kidnapping and her death in the course of the kidnapping under the circumstances, particularly in the light of Gray's own statement about placing his hands on the child's vagina, (although denying doing more), are properly provable as part of the res gestae. See Cameron v. State, 233 Miss. 404,102 So.2d 355 (1958).
In Brooks v. State, 242 So.2d 865 (Miss. 1971) this Court said:
 The `acid test is its logical relevancy to the particular excepted purpose or purposes' for which the evidence of prior offenses is sought to be introduced, `and the considerations justifying the reception of evidence of other similar crimes has been held by some courts to be peculiarly applicable in prosecutions for sexual offenses.' Id. § 321.
 (242 So.2d at p. 869).
Where evidence is admissible as res gestae, it will not be excluded because it may tend to inflame the minds of the jury or would tend to indicate the commission of another crime. Petersonv. State, 227 Ala. 361, 150 So. 156, 161 (1933), cert. den.,291 U.S. 661, 54 S.Ct. 439, 78 L.Ed. 1053 (1934). *Page 1001 
We hold that the testimony of the pathologist and the pictures about which he testified were admissible not only to show motive but also as part of the res gestae.
 III. GRAY'S STATEMENTS INTRODUCED IN EVIDENCE WERE FREELY AND VOLUNTARILY GIVEN AND WERE PROPERLY ADMITTED.
Assigned as error is that statements given by Gray, orally and in writing, and introduced into evidence upon the trial of the guilt phase were not freely or voluntarily given.
The first criticism of the statement taped, transcribed and signed by Gray is that it lost its voluntary character because an officer had suggested to Gray that he omit a reference to the fact that he, Gray, was on parole from his Arizona murder conviction. The officer's suggestion was in Gray's interest and made to prevent the inclusion of a statement of fact prejudicial to Gray. If it was desired that the circumstances of this incident be imparted to the jury, the officer could have been recalled by appellant to testify about it. We are unable to say that Gray was prejudiced by this incident. There was no objection during the trial that this statement had become involuntary for this reason now urged upon the Court. In order to put the trial judge in error it was necessary that the particular objection be made contemporaneously in order that he might rule upon it. Counsel may not be permitted to reserve an objection until after the completion of the trial and after the conviction of the defendant, and urge it for the first time on appeal. McGarrh v.State, 249 Miss. 247, 148 So.2d 494 (1963). Gray himself testified that his statement had been freely and voluntarily given. The evidence is conclusive that Gray had been given and understood his rights under Miranda and knowingly and intelligently waived them, including his right to remain silent. It is clear that Gray's statement, recorded on tape and later reduced to writing, and, after it had been corrected by him and retyped, signed by him, was voluntary. Jenkins v. State,214 So.2d 470 (Miss. 1968). Gray had been repeatedly given the warnings required by Miranda and it is not suggested that his statements thereafter are coerced or the result of mistreatment, intimidation or improper inducements. The only instance of a threat or intimidation testified to by appellant is alleged to have occurred when he was first taken to headquarters and he and the officers had begun their ascent in the elevator. Gray testified that one of the officers had a bunch of heavy keys in his hand and threatened to work on his face with them and had intimated that they would take him out and kill him.
The trial court was correct in admitting Gray's statements as having been freely and voluntarily given.
 IV. PREJUDICIAL ERROR DID NOT RESULT FROM STATEMENT BY CHILD'S MOTHER.
The remaining assignment going to the trial of the guilt phase, has to do with an incident that occurred while Mrs. Scales, the child's mother, was testifying. The relevant part of the interrogation of the witness by the District Attorney and her responses were as follows:
 Q. What happened then when the police arrived?
 A. Well, we proceeded to look in all the appartments (sic) whether the people were there or they weren't. And the only apartment we didn't get to go in was his.
 Q. By his, who do you mean Mrs. Scales?
 A. Jimmy Gray.
 Q. Can you identify the person you call Mr. Gray?
 A. Yes I can.
 Q. And where is he seated in the courtroom?
 A. He's seated right there.
 Q. Would I be correct in pointing out this gentlemen here?
 BY MR. MOORE: Let the record reflect that the defendant has been identified.
 BY MR. MOORE: (Continuing)
 Q. You said every apartment except Mr. Gray's apartment. What do you mean by that? *Page 1002 
 A. He wasn't there.
 Q. O.K., you knocked on the door. Is that right?
 A. Yes.
 Q. O.K. What did you do then when you couldn't gain entrance there?
 A. Well the police were there by that time and I told them that I suspected him, cause he was all the time messing with the children anyway.
 BY MR. WRIGHT: We object, Your Honor.
 BY THE COURT: Objection sustained.
 BY MR. WRIGHT: As a matter of fact we're going to make a move for a mistrial on that.
 BY THE COURT: Disregard that last statement ladies and gentlemen. Motion for a mistrial will be overruled.
Appellant suggests that the statement of the mother in explaining her actions in her search for the missing child, suspected Gray "cause he was all the time messing with the children anyway," implied sexual misconduct with the children on the part of Gray. We are unable to accept appellant's conclusion that the statement suggested to the jury sexual misconduct with the children on the part of Gray. The use of the words "mess with" constitute a familiar colloquialism in common use, at least in this part of the country. Of some dozen or more definitions of "mess" in the Webster's New International Dictionary none has any connotation of sexual misconduct or immorality. We are unable to construe the language used as carrying an implication such as that suggested by appellant. Moreover, it is obvious that the mother's answer was not the result of prosecutorial impropriety. It was not in response to the question by the prosecutor but was a statement simply volunteered by the witness in the simple language in which she was accustomed to speak. Moreover, the court promptly sustained the objection, and upon the request of appellant, directed the jury to disregard the last statement.
In Duke v. State, 340 So.2d 727 (1977) this Court said:
 The court properly admonished the jury. We have held in many cases that when an objection to testimony is sustained and the jury is admonished to disregard it there is no reversible error. Herron v. State, 287 So.2d 759 (Miss. 1974).
 In Holifield v. State, 275 So.2d 851 (Miss. 1973) we held that when the court sustains an objection to improper testimony or improper remarks of counsel participating in the trial, it is presumed, unless otherwise shown, that the jury followed the directions of the trial judge to disregard such comment or testimony.
 We hold that no error was committed by the court in refusing the mistrial because he properly admonished the jury. . . .
 (340 So.2d at 731).
In Forrest v. State, 335 So.2d 900 (Miss. 1976) it was stated:
 The general rule is that where the trial judge sustains defendant's objection to the remarks and instructs the jury to disregard the statement, the remedial acts of the court are usually sufficient to remove any taint of prejudice. . . . (335 So.2d at 903).
No dictionary definition has been cited in support of appellant's present contention that there was an imputation to Gray of some impropriety by the use of the quoted language, nor was any proof offered to show that the words "mess with" carried locally any such meaning as appellant would now assign to them. In any event, the court sustained appellant's objection and instructed the jury to disregard the statement of the witness.
There is no merit in the assignment that this incident constituted prejudicial error.
ASSIGNMENT OF ERROR RELATING TO THE TRIAL OF THE PUNISHMENT PHASE V. THE SENTENCE OF DEATH WAS NOT WANTONLY AND FREAKISHLY IMPOSED.
At the sentencing phase of the trial the State relied upon the testimony and *Page 1003 
exhibits introduced upon the trial of the guilt phase and, in addition, introduced a copy of the judgment and sentence of the Superior Court of Arizona, certified according to the Act of Congress, in the case of State of Arizona v. Jimmy Lee Gray,
No. 5144, showing that the appellant, Jimmy Lee Gray, pursuant to a plea of guilty, was sentenced to serve not less than twenty years nor more than the term of his natural life, on March 7, 1968, for the crime of second degree murder.
The appellant introduced a ". . . psychological evaluation (report) from the Arizona State Prison, Psychological Department, in Florence, Arizona . . . [dated July 17, 1969]." In addition, appellant relied upon prior testimony in the guilt phase of the trial, and rested.
In rebuttal, the State produced psychologist, Charlton Stanley, an employee of the Mississippi State Hospital at Whitfield.
Stanley testified, among other things, that:
 A. . . . I first saw Jimmy Lee Gray on December 3, 1976, at which time I interviewed him for exactly an hour and a half. I did two interviews with him on that day, for a total of an hour and a half. We saw him again on the, on January 23, 24 of this year, at which time he was given a battery of psychological tests and which we read and evaluated at that time.
Wide latitude was allowed appellant in cross-examination of this witness.
The substance of Stanley's testimony was that he had found no indication that Gray was suffering from any pathological mental disease. He stated that Gray had denied to him that he had molested the child sexually and had asserted that the child's death had resulted accidentally from drowning. Stanley said that Gray was of ". . . bright, normal intelligence, with an I.Q. score of 112. . . ." He testified that Gray was highly emotional and his ". . . emotional reactivity is characterized by hostility and anger. He becomes very angry very easily." He said that Gray suffered from ". . . what is called a personality disorder, character disorder, which means that he has a personality which basically [is] a hostile one and aggressive personality. But there's nothing crazy about it. He simply is a young man that won't learn by his mistakes, because he doesn't make mistakes. It's always somebody else's fault." In his opinion Gray knew right from wrong.
He said that Gray was sexually immature, but "there are no elements or features in any of the test material to suggest delusions or psychosis, or any kind of major mental thinking disorder. This is an above average young man in intelligence."
Dr. Stanley referred to the report from the Psychological Department of the Arizona State Prison, introduced by appellant, saying of it, "It's a printout of the test of Minnesota Multibasic Personality Inventory, with which I'm quite familiar." Moreover, Stanley felt that the fact that the test had been conducted nine years ago reduced the document's validity.
Following Gray's conviction, the trial court submitted for the jury's consideration, by Instruction No. 15, as aggravating circumstances the following:
 1. The Murder of Deressa Jean Scales was committed by the Defendant, Jimmy Lee Gray, while the said Defendant was under a sentence of life imprisonment by the Superior Court of the State of Arizona, County of Yuma, imposed on the 7th day of March, 1968, in Cause number 5144 of the said Court.
 2. The Capital Murder was committed while the Defendant was engaged in the commission of the crime of kidnap,
 3. The Capital Murder was committed for the purpose of avoiding or preventing the detection and lawful arrest of the Defendant, and
 4. The commission of the Capital Murder in this case was especially heinous, atrocious, or cruel.
The trial court also submitted for the jury's consideration as mitigating circumstances the following:
 1. The offense was committed while the Defendant was under the influence of extreme mental or emotional disturbance. *Page 1004 
 2. The capacity of the Defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.
 3. Any other matter brought before you which you deem to be mitigating on behalf of the Defendant.
By its verdict the jury found unanimously beyond a reasonable doubt that all of the aggravating factors or circumstances enumerated in the instruction had, in fact, existed and made no finding of the existence of any mitigating circumstance. The verdict was as follows:
 We, the Jury, find unanimously, after weighing the mitigating circumstances and aggravating circumstances, one against the other, that the mitigating circumstances do not out-weigh or overcome the aggravating circumstances, and that the defendant should suffer the penalty of death. We, the Jury, find unanimously beyond a reasonable doubt and that the following statutory aggravating circumstances exist in this case, to-wit: Items 1, 2, 3, and 4 of Instruction C-15.
It is now contended in Gray's behalf that a "very serious" dispute exists as to whether Gray had the deliberate design to effect the death of the child. However, the jury had before it all of the evidence given during the trial of the guilt phase. Moreover, the trial court had instructed the jury that it might find as a mitigating circumstance "Any other matter brought before you which you deem to be mitigating on behalf of the Defendant." From Gray's statements introduced into evidence and from the testimony of Dr. Stanley, the jury was fully aware of the statements made by Gray that the child's death had been accidental. Upon the entire record, the jury was justified in finding beyond a reasonable doubt that the child had been killed by Gray intentionally and maliciously for the purpose of silencing her outcries or preventing the report by her of acts of molestation. The crime was brutish and cruel, committed upon a helpless and trusting child, for a sordid motive. It was the second human life appellant had taken.
In Bell v. State, 360 So.2d 1206 (Miss. 1978), Bell admitted that he had participated voluntarily in the robbery but denied that he had been the "trigger man." Other testimony was sufficient to support a finding by the jury that, on the contrary, Bell actually had pulled the trigger. In Bell this Court said:
 Balancing the mitigating factors before the jury against the aggravating factors before the jury, we cannot say the jury was erroneous in its conclusion. The jury was fully aware of Bell's denial that he actually shot the victim and aware of his testimony that he had asked McFarland not to shoot the victim at one time. They also had before them the testimony relating to the use of drugs prior to the execution. However, in balancing this against Bell's clear and voluntary participation in armed robbery, kidnapping and the execution style murder, the jury concluded the death sentence was required. We cannot say the jury was incorrect but rather they were more than justifiably correct.
 (360 So.2d at 1213).
Further, in Bell, this Court articulated its role in death penalty cases as follows:
 (1) Automatic review as a preference case;
 (2) Review of the aggravating and mitigating circumstances to determine whether the punishment of death is too great when the two are weighed against each other; and
 (3) Comparison to similar cases to insure that the death sentence is not inflicted in a wanton or freakish manner but in a consistent and even-handed manner. Bell v. State, 360 So.2d at p. 1211 summarizing Jackson v. State, 337 So.2d 1242, 1255-56 (Miss. 1976).
Mississippi Code Annotated, section 99-19-105(2)(3) (Supp. 1978) provides:
 (2) The Mississippi Supreme Court shall consider the punishment as well as any errors enumerated by way of appeal.
 (3) With regard to the sentence, the court shall determine: *Page 1005 
 (a) Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor;
 (b) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in section 99-19-101; and
 (c) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
In Jordan v. State, 365 So.2d 1198 (Miss. 1979), the Court said:
 The present case reveals that Jordan, twenty-nine years old, a former member of the armed forces, out of a desire to obtain money, abducted Mrs. Marter at gunpoint and fatally shot her out in the woods when she tried to escape. Afterward, he continued with his grotesque scheme to obtain money by demanding and receiving a ransom from his victim's husband. The record is devoid of proof of Jordan's past criminal record, if any. Our careful review of the entire record in this case, and comparing it with the other cases involving death penalties affirmed since Jackson, supra, establishes that the death penalty here is not excessive when the aggravating and mitigating circumstances are weighed against each other. Infliction of that penalty here will not in any manner be either wanton or freakish, and will be consistent and evenhanded with other death penalty cases previously affirmed by this Court. (365 So.2d at 1207).
 CONCLUSION
The present case has been heard by the full Court, sitting en banc, and carefully reviewed in the manner set forth in Bell,supra, and that prescribed by Mississippi Code Annotated section99-19-105(2)(3) (Supp. 1978). We have concluded that the circumstances in evidence amply support a finding that the killing of the three year old child by Gray was "especially heinous, atrocious and cruel". It was a brutal killing for a sordid purpose of a helpless child. The jury was warranted, from the evidence before it, in finding that the aggravating circumstances outweighed any circumstance reflected by the evidence which might conceivably be considered a mitigating circumstance. The death penalty in this case was neither wantonly nor freakishly imposed.
We find that: the sentence of death was not imposed in this case under the influence of passion, prejudice or any other arbitrary factor; that the evidence supports the jury's finding of statutory aggravating circumstances as enumerated in Mississippi Code Annotated section 99-19-105(2)(3) (Supp. 1978); and, having considered both the crime and the defendant, we find that the sentence of death in this case is not excessive or disproportionate to similar cases in which such sentence has been imposed.
The facts and circumstances in this case have been carefully compared with those in other cases in which this Court has affirmed the imposition of the death penalty. The decision in the present case is consistent with conclusions reached in other cases before this Court in which the death penalty has been imposed.
Other contentions made by appellant have been considered and have been found to be without merit.
Gray has been accorded due process, his rights have been carefully protected by this Court in awarding him a new trial following his first conviction, and his trial which resulted in the conviction from which he now appeals was fairly conducted.
Gray's conviction of capital murder and the sentence of death imposed upon him will be affirmed.
Affirmed and Wednesday, October 31, 1979 is set as the date of execution of the death sentence.
PATTERSON, C.J., ROBERTSON, P.J., and SUGG, WALKER, BROOM, LEE, BOWLING and COFER, JJ., concur. *Page 1006