SEPTEMBER 1, 1983

No. 83–5290 (A–134).   GRAY v. LUCAS, WARDEN, ET AL. C. A. 5th Cir.   Certiorari denied.   Application for stay of execution, scheduled for 12:01 a.m. on September 2, 1983, addressed to JUSTICE BRENNAN and referred to the Court, denied.   JUSTICE STEVENS would grant the application for stay.

THE CHIEF JUSTICE, concurring.

On August 23, 1983, the applicant, Jimmy Lee Gray, filed a third petition for certiorari and an application for a stay of execution addressed to JUSTICE WHITE.   JUSTICE WHITE denied petitioner's application for a stay on August 25, 1983, and the following day, the Mississippi Supreme Court set petitioner's execution for September 2, 1983.   Now before the Court is petitioner's petition for certiorari and his reapplication for a stay of execution addressed to JUSTICE BRENNAN, and referred to the Court.

The facts and procedural history have not been referred to in the dissent.   Since they are critical, they are set forth as

follows: (1) In October 1976, petitioner was indicted for capital murder. At trial, the State proved that on June 25, 1976, petitioner abducted a 3-year-old girl, carried her to a remote area, and after sexually molesting her, suffocated her in a muddy ditch and threw her body into a stream. Petitioner was convicted and sentenced to death. (2) On appeal, the Mississippi Supreme Court reversed the conviction and remanded the case for a new trial. *Gray* v. *State,* 351 So. 2d 1342 (1977). (3) On retrial in 1978, Gray was again convicted of capital murder and sentenced to death. (4) The Mississippi Supreme Court affirmed both the conviction and the death sentence. *Gray* v. *State,* 375 So. 2d 994 (1979). (5) We denied petitioner's petitions for certiorari and rehearing. *Gray* v. *Mississippi,* 446 U. S. 988, rehearing denied, 448 U. S. 912 (1980).

(6) Petitioner filed his first applications for a writ of error *coram nobis* and stay of execution before the Mississippi Supreme Court in July 1980. (7) After the state court's summary denial of the writ, petitioner filed a petition for a writ of habeas corpus in the Federal District Court for the Southern District of Mississippi. The court conducted an evidentiary hearing with respect to several of Gray's 22 claims of constitutional violation and denied relief. (8) The Court of Appeals for the Fifth Circuit affirmed and denied petitioner's motion for rehearing. *Gray* v. *Lucas,* 677 F. 2d 1086, rehearing denied, 685 F. 2d 139 (1982). (9) A petition for certiorari and rehearing were once again denied by this Court. 461 U. S. 910 (1983); 462 U. S. 1124 (1983). On May 11, 1983, the Mississippi Supreme Court set the execution date for July 6, 1983.

(10) On June 22, 1983 petitioner submitted to the Mississippi Supreme Court a second motion for stay of execution along with a new application for a writ of error *coram nobis.* The petition raised, among others, those claims now before this Court. The Mississippi Supreme Court denied all re-

quested relief on June 29, 1983. (11) Petitioner thereupon filed his second petition for a writ of habeas corpus in the Federal District Court, reasserting those claims he had submitted to the Mississippi Supreme Court. (12) On July 2, 1983, the Court of Appeals granted petitioner's application for a stay of execution. (13) The District Court dismissed the petition for habeas corpus on July 8, 1983. (14) The Court of Appeals affirmed, *Gray* v. *Lucas*, 710 F. 2d 1048 (1983), and denied petitioner's petition for rehearing. The stay was dissolved on August 26, 1983.

This case has been in state and federal courts for seven years. It has been tried twice in the state court and reviewed by the Mississippi Supreme Court four times. Seventeen different federal judges have reviewed petitioner's case, and this Court has previously acted on this case four times prior to JUSTICE WHITE's denial of petitioner's application for a stay last week. Over the past seven years, judicial action reviewing this case has been taken 82 times by 26 different state and federal judges.

Petitioner's latest claims have been reviewed by several courts in both the state and federal systems. Petitioner's principal claim, which JUSTICE MARSHALL addresses in his dissent, is that the lethal gas method of execution constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. In my view, no evidentiary hearing on the effects of lethal gas is required. A number of affidavits describing such effects were filed with and considered by the Court of Appeals, and the contents of several of these have been set forth in the dissent today of JUSTICE MARSHALL. For purposes of my vote in this case, I accept the truth of the affidavits submitted by the petitioner, but nevertheless conclude—as did the Court of Appeals—that they do not as a matter of law establish an Eighth Amendment violation. I agree with the Court of Appeals that the showing made by petitioner does not justify a court holding that, "as a

matter of law or fact, the pain and terror resulting from death by cyanide is so different in degree or nature from that resulting from other traditional modes of execution as to implicate the eighth amendment right." *Gray* v. *Lucas*, 710 F. 2d, at 1061.

This case illustrates a recent pattern of calculated efforts to frustrate valid judgments after painstaking judicial review over a number of years; at some point there must be finality. I join the Court's action denying the petition for certiorari and denying a stay of execution.

JUSTICE MARSHALL, with whom JUSTICE BRENNAN joins, dissenting.

In this application for a stay, petitioner asks simply that we postpone his execution long enough to allow us to consider and dispose of his pending petition for certiorari in which he challenges the decision of the United States Court of Appeals for the Fifth Circuit affirming the denial of his request for a writ of habeas corpus. *Gray* v. *Lucas*, 710 F. 2d 1048 (1983). I would grant the application.[1]

Petitioner argues that the method by which the State of Mississippi plans to execute him—exposure to cyanide gas—constitutes cruel and unusual punishment. In support of that claim, he submitted to the United States District Court for the Southern District of Mississippi numerous affidavits that described in graphic and horrifying detail the manner in which death is induced through this procedure.[2] *Gray* v.

---

[1] Even if his petition for certiorari did not present the substantial constitutional claim discussed below, I would nevertheless grant petitioner's application for a stay, grant certiorari, and vacate petitioner's death sentence in accordance with my view that the death penalty is unconstitutional in all circumstances. *Gregg* v. *Georgia*, 428 U. S. 153, 231 (1976) (MARSHALL, J., dissenting).

[2] The District Court never assessed the relevance of these affidavits because it disposed of the claim on procedural grounds. The court determined that petitioner had neglected to present this Eighth Amendment

*Lucas,* No. S83–0546(C) (July 8, 1983). For example, Dr. Richard Traystman, Director of the Anesthesiology and Critical Care Medicine Research Laboratories at Johns Hopkins Medical School, described the process as follows:

> "'Very simply, cyanide gas blocks the utilization of the oxygen in the body's cells. * * * Gradually, depending on the rate and volume of inspiration, and on the concentration of the cyanide that is inhaled, the person exposed to cyanide gas will become anoxic. This is a condition defined by no oxygen. Death will follow through asphyxiation, when the heart and brain cease to receive oxygen.
>
> "'The hypoxic state can continue for several minutes after the cyanide gas is released in the execution chamber. The person exposed to this gas remains conscious for a period of time, in some cases for several minutes, again depending on the rate and volume of the gas that is inhaled. During this time, the person is unquestionably experiencing pain and extreme anxiety. The pain begins immediately, and is felt in the arms, shoulders, back, and chest. The sensation is similar to the pain felt by a person during a heart attack, where essentially, the heart is being deprived of oxygen. The severity of the pain varies directly with the diminishing oxygen reaching the tissues.
>
> "'The agitation and anxiety a person experiences in the hypoxic state will stimulate the autonomic nervous system. . . . [The person] . . . may begin to drool, urinate, defecate, or vomit. There will be a muscular con-

---

claim in state-court proceedings and therefore had forfeited his right to raise the issue in federal court. *Wainwright* v. *Sykes,* 433 U. S. 72 (1977). The District Court also reasoned that, since petitioner's original counsel did not include this claim in a previous federal habeas corpus petition, petitioner had waived the claim, and it would be an abuse of the writ for him to try to raise it in his current habeas petition. See *Sanders* v. *United States,* 373 U. S. 1, 17–19 (1963); 28 U. S. C. § 2254 Rule 9(b).

tractio[n]. These responses can occur both while the person is conscious, or when he becomes unconscious.

"'When the anoxia sets in, the brain remains alive for from two to five minutes. The heart will continue to beat for a period of time after that, perhaps five to seven minutes, or longer, though at a very low cardiac output. Death can occur ten to twelve minutes after the gas is released in the chamber.'" *Gray* v. *Lucas*, 710 F. 2d, at 1060.

Dr. Traystman further testifed that the lethal-gas method is sufficiently painful that it is disfavored in the scientific community as a way of putting animals to sleep. "'We would not use asphyxiation, by cyanide gas or by any other substance, in our laboratory to kill animals that have been used in experiments—nor would most medical research laboratories in this country use it.'" *Ibid.*

Other affiants described in less clinical language the effects of the procedure when used to execute people:

"'When the cyanide gas reached [the prisoner], he gasped, and convulsed strenuously. He stiffened. His head lurched back. His eyes widened, and he strained as much as the straps that held him to the chair would allow. He unquestionably appeared to be in pain.

"'Periodically now, perhaps at thirty second intervals, he would convulse, alternately straining and relaxing in the chair. I noticed he had urinated. The convulsions continued for approximately ten more minutes, and you could see his chest expand, and then contract, trying to take in fresh air. These movements became weaker as the minutes ticked away. You could not tell when [he] finally lost consciousness.

"'According to prison officials, [he] died . . . approximately 12 minutes after the cyanide pellets had dropped in the chamber. Death was pronounced after the shade

on our observation window had been drawn, though there was still some slight movement in the body.

.        .        .        .        .

"'The pellets of cyanide were released by mechanical controls, and dropped into an acid jar beneath the chair. The gas rose, and seemed to hit him immediately. Within the first minute [he] slumped down. I thought to myself how quickly cyanide really worked.

"'Within 30 seconds he lifted his head upwards again. He raised his entire body, arching, tugging at his straps. Saliva was oozing from his mouth. His eyes open, he turned his head to the right. He gazed through my window. His fingers were tightly gripping his thumbs. His chest was visibly heaving in sickening agony. Then he tilted his head higher, and rolled his eyes upward. Then he slumped forward. Still his heart was beating. It continued for another several minutes.

"'He was pronounced dead, twelve minutes after the pellets were released, by the doctor who could hear his heart through the stethoscope, die.'" *Id.*, at 1058–1059.

The Court of Appeals accepted[3] petitioner's "proffered facts as proven." *Id.*, at 1061. Specifically, the court adopted petitioner's description of the method of execution

---

[3] The Court of Appeals did not share the District Court's view that federal court review of this claim was procedurally barred. See n. 2, *supra.* The Circuit rejected the District Court's finding of forfeiture and ruled that, in reaching petitioner's claim on the merits, "the Mississippi Supreme Court itself removed any procedural bar which might otherwise impede a federal court's hearing on the merits." 710 F. 2d, at 1052, n. 2. The Circuit did not explicitly consider the District Court's "abuse of writ" ground for dismissal, but by electing to reach the merits of the claim, the court implicitly held that petitioner had offered adequate explanation of why the issue had not been raised in his first habeas corpus petition. In his brief to the Court of Appeals, petitioner explained that his original counsel had been unaware of the excruciating side effects of execution by lethal gas and that the current trend against the use of lethal gas was not yet evident

as that of "death by cyanide gas, causing asphyxiation at the cost of protracted pain over a period that may exceed seven minutes." *Ibid.* The court refused, nevertheless, to reverse the District Court's decision denying petitioner an evidentiary hearing, reasoning that, "under present jurisprudential standards," petitioner's allegations were insufficient "to implicate the eighth amendment right." *Ibid.*

In my view, if the lethal-gas method operates in the manner described by petitioner, the Court of Appeals clearly erred in ruling that the method is not "cruel" under "present jurisprudential standards." The Eighth Amendment proscribes "punishments which are incompatible with 'the evolving standards of decency that mark the progress of a maturing society.'" *Estelle* v. *Gamble,* 429 U. S. 97, 102 (1976) (quoting *Trop* v. *Dulles,* 356 U. S. 86, 101 (1958)). Identification of those standards is sometimes difficult, but two principles have long been beyond dispute. First, "[p]unishments are cruel when they involve torture or a lingering death." *In re Kemmler,* 136 U. S. 436, 447 (1890). Second, punishments are cruel when they "involve the unnecessary and wanton infliction of pain." *Gregg* v. *Georgia,* 428 U. S. 153, 173 (1976). A corollary of the second principle is that "no court would approve any method of implementation of the

---

when petitioner filed his first federal habeas corpus petition. See *infra,* at 1246, and nn. 6 and 7. Alternatively, the Court of Appeals may quite correctly have concluded that, given the equitable nature of habeas relief, the District Court should not have denied petitioner an opportunity to challenge the means by which he will die simply because his attorney neglected to append the claim to an earlier petition. See *Fay* v. *Noia,* 372 U. S. 391, 438–440 (1963); *Sanders* v. *United States,* 373 U. S., at 17–18.

Relying on this Court's recent opinion in *Barefoot* v. *Estelle, ante,* p. 880, respondents suggest that second and successive habeas corpus petitions in death penalty cases should receive heightened scrutiny. I disagree. The majority in *Barefoot* explicitly endorsed the *Sanders* standard for reviewing second and successive petitions in death penalty cases. *Ante,* at 895. Since petitioner established that his failure to bring this claim in his previous petition was not an abuse of the writ under *Sanders,* the courts below were obliged to consider the claim on the merits.

death sentence found to involve unnecessary cruelty in light of presently available alternatives." *Furman* v. *Georgia*, 408 U. S. 238, 430 (1972) (POWELL, J., joined by BURGER, C. J., and BLACKMUN and REHNQUIST, JJ., dissenting); see also *id.*, at 279 (BRENNAN, J., concurring).

The Court of Appeals failed to apply either of the foregoing principles to the case before it. Instead, the court attempted to assess the "pain and terror" associated with "traditional modes of execution" (such as hanging) and concluded that the difference between the trauma associated with the use of lethal gas and the trauma associated with those traditional methods was not so great as to render the former constitutionally infirm. *Gray* v. *Lucas*, 710 F. 2d., at 1061. Had the court made an effort to apply the proper legal standards, it seems highly likely that it would have found the lethal-gas method to be unconstitutional. A death that, as the court recognized, involves extreme pain over a span of 10 to 12 minutes surely must be characterized as "lingering," see *In re Kemmler, supra*. And petitioner directed the court's attention to at least one readily available alternative method of administering the death penalty that, though equally barbaric in its effects, involves far less physical pain than the use of cyanide gas;[4] it seems indisputable, therefore, that the lethal-gas method is "unnecessarily cruel."

That execution through the administration of lethal gas violates the Eighth Amendment is confirmed by examination of the treatment accorded the method in recent years by the state legislatures. This Court has often indicated that assessment of the constitutional status of a given punishment "'should be informed by objective factors to the maximum

---

[4] That method is the lethal-injection procedure, which involves intravenous injection of a fast-acting barbituate combined with a paralytic agent. See Royal Commission on Capital Punishment, 1949–1953 Report, Cmd. No. 8932, p. 257 (1980); Gardner, Executions and Indignities—An Eighth Amendment Assessment of Methods of Inflicting Capital Punishment, 39 Ohio St. L. J. 96, 128–129 (1978).

possible extent.'" *Enmund* v. *Florida*, 458 U. S. 782, 788 (1982) (quoting *Coker* v. *Georgia*, 433 U. S. 584, 592 (1977) (plurality opinion)). Among the most important of those factors is the direction in which contemporary "legislative judgments" are moving. *Enmund* v. *Florida, supra.* Between 1921 and 1973, several States by statute adopted the lethal-gas method. In most instances, the abandonment of the scaffold or electric chair in favor of the gas chamber was prompted by humanitarian motives; asphyxiation was regarded as a less painful and more dignified way of administering the death penalty than hanging or electrocution.[5] However, as awareness of the trauma associated with the lethal-gas method grew and as the lethal-injection method became better known, the trend was reversed. In the past decade, no State has adopted the lethal-gas method. By contrast, three States that formerly employed the gas chamber exclusively have altered their laws to require or permit use of the injection procedure.[6] At least two other States that never had used the gas chamber considered adopting the method but rejected it in favor of the injection system.[7] At present, only 7 of the 39 jurisdictions that retain the death penalty require use of the gas chamber.[8] This evolving con-

---

[5] See L. Berkson, The Concept of Cruel and Unusual Punishment 29–31 (1975).

[6] See 1983 Nev. Stats., ch. 601, § 1 (amending Nev. Rev. Stat. § 176.355 (1979)); N. M. Stat. Ann. § 31–14–11 (Supp. 1983); 1983 N. C. Sess. Laws, ch. 678 (amending N. C. Gen. Stat. § 15–187 (1978)).

[7] See 1977 Okla. Sess. Law, ch. 41, § 1; 1977 Tex. Gen. Laws, ch. 138, § 1.

[8] The seven States are Arizona (Ariz. Rev. Stat. Ann. § 13–704 (Supp. 1982–1983)); California (Cal. Penal Code Ann. § 3604 (West 1982)); Colorado (Colo. Rev. Stat. § 16–11–401 (1978)); Maryland (Md. Ann. Code, Art. 27, § 71 (1982)); Mississippi (Miss. Code Ann. § 99–19–51 (1972)); Missouri (Mo. Rev. Stat. § 546.720 (1978)); and Wyoming (Wyo. Stat. § 7–13–904 (1977)).

A similar situation was presented in *Enmund* v. *Florida*, 458 U. S. 782 (1982). In that case, the Court relied significantly upon the fact that "only a small minority of jurisdictions—eight—allow the death penalty to be imposed solely because the defendant somehow participated in a robbery in the course of which a murder was committed" in holding unconstitutional the use of capital punishment under such circumstances. *Id.*, at 792.

sensus against compulsory use of the lethal-gas method buttresses the conclusion that the procedure must now be considered "cruel."

Under these circumstances, the majority's decision to deny the stay, thereby authorizing the execution of petitioner before we can even consider his petition for certiorari, seems to me unconscionable. Petitioner has presented a substantial challenge to the constitutionality of Mississippi's method of execution. The Court of Appeals has denied petitioner a hearing to develop his claim. *Townsend* v. *Sain,* 372 U. S. 293 (1963). Yet a majority of this Court declines to delay petitioner's execution a few more weeks until we can consider through our traditional means of deliberation whether this case raises issues of sufficient import to grant a writ of certiorari.

I dissent from the denial of the stay.