[No. S130489. May 21, 2007.]

THE PEOPLE, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
RONALD DECKER, Real Party in Interest.

**4**

COUNSEL

Steve Cooley, District Attorney, Lael R. Rubin, Head Deputy District Attorney, Patrick D. Moran and Matthew G. Monforton, Deputy District Attorneys, for Petitioner.

No appearance for Respondent.

Roger J. Rosen and Diane E. Berley for Real Party in Interest.

## OPINION

BAXTER, J.—Defendant and real party in interest Ronald Decker has been charged with the attempted willful, deliberate, and premeditated murder of his sister, Donna Decker, and her friend, Hermine Riley Bafiera. (Pen. Code, § 664, subd. (a).) According to the evidence offered at the preliminary hearing, Decker did not want to kill these women himself—as he explained, "he would be the prime suspect" and "would probably make a mistake somehow or another"—so he sought the services of a hired assassin.

Decker located such a person (or thought he did). He furnished the hired assassin with a description of his sister, her home, her car, and her workplace, as well as specific information concerning her daily habits. He also advised the assassin to kill Hermine if necessary to avoid leaving a witness behind. Decker and the hired assassin agreed on the means to commit the murder, the method of payment, and the price. The parties also agreed that Decker would pay $5,000 in cash as a downpayment. Before Decker handed over the money, the assassin asked whether Decker was "sure" he wanted to go through with the murders. Decker replied, "I am absolutely, positively, 100 percent sure, that I want to go through with it. I've never been so sure of anything in my entire life." All of these conversations were recorded and videotaped because, unknown to Decker, he was talking with an undercover police detective posing as a hired assassin.

Decker does not dispute that the foregoing evidence was sufficient to hold him to answer to the charge of solicitation of the murder of Donna and Hermine but argues that this evidence was insufficient to support a charge of their attempted murder. The magistrate and the trial court, believing themselves bound by *People v. Adami* (1973) 36 Cal.App.3d 452 [111 Cal.Rptr. 544] (*Adami*), reluctantly agreed with Decker and dismissed the attempted murder charges. The Court of Appeal disagreed with *Adami* and issued a writ of mandate directing the respondent court to reinstate the dismissed counts. We granted review to address the conflict and now affirm.

BACKGROUND

Ronald Decker was charged by felony complaint with the attempted willful, deliberate, and premeditated murder of his sister, Donna Decker, and her friend, Hermine Riley Bafiera; the solicitation of Detective Wayne Holston to commit these murders; and the solicitation of Russell Wafer to murder Donna Decker. The undisputed evidence presented at the preliminary hearing revealed the following:

On August 20, 2003, Ronald Decker (identifying himself only as "Ron") placed a telephone call to Russell Wafer, a gunsmith at Lock, Stock and Barrel in Temple City (Los Angeles County). Decker said he was looking for someone to do some "work" for him and arranged to meet privately with Wafer the following week. During that meeting, Decker explained that he had been in contact with Soldier of Fortune Magazine, had done some research, and came up with Wafer's name as a possible "contractor" for a local "job"—"basically it was that he wanted someone taken care of." Decker added that he could not kill the victim himself because he would be a prime suspect. Wafer advised that while he could not handle the job, his friend "John" from Detroit might be interested. After Decker offered to pay the killer $35,000 and an additional $3,000 to Wafer as a finder's fee, Wafer said he would try to contact John. He instructed Decker to call him back the following week.

In reality, however, Wafer did not know a "John" in Detroit who would be interested in a contract murder. Wafer instead called the Los Angeles County Sheriff's Department, spoke to Detective Wayne Holston, and agreed to assist in a sting operation. When Decker called Wafer on September 2, Wafer claimed he had been in contact with "John," who was coming to town shortly. Wafer asked Decker for his phone number and promised to arrange a

meeting with "John." Based on the physical description Wafer had provided and on the phone number Decker had supplied, Holston located a photograph of Decker. Wafer immediately recognized Decker as "Ron," the man he had met the previous week. At Holston's request, Wafer arranged a meeting with Decker for the evening of September 5 at a golf course parking lot in Arcadia. Holston accompanied Wafer to the meeting and was introduced as "John" from Detroit. Holston was wearing a "wire," and the encounter was both videotaped and recorded.

After Wafer left the two men alone, Decker explained that a "lady" owed him a lot of money and that the only way for him to get it back was "to take her out." Decker subsequently identified the target as his sister, Donna Decker, and provided descriptions of her person, her mode of dress, her residence, her office, her car, and her daily habits. Decker offered Holston $25,000 to perform the execution, with a $10,000 bonus if it were a "nice, neat, clean job." Decker reiterated that he could not do it himself, as "he would be the prime suspect," and might "slip up" somewhere. When Decker proposed that Holston kill Donna in an automobile accident, Holston warned him that she might survive such an accident. Decker agreed that this might not be the best method, since he wanted her "totally expired," and said he appreciated Holston's advice: "I want a professional—someone that's gonna do the job, and do it right—and do it right." When Holston then proposed killing Donna during a staged robbery or carjacking, Decker said that would be "great" and urged Holston to "shoot her in the heart and head both, just to make sure." Decker added that Donna spent a lot of time with her friend and coworker, Hermine Riley Bafiera, and that Holston might need to "take out" Hermine as well to avoid having a witness. Decker did not care for Hermine, either.

When Holston said he could complete the job within a week, Decker replied, "Marvelous. . . . The sooner the better." Holston also asked for some money up front, and Decker said he could supply him with $5,000 in cash as a downpayment in a couple of days "so you can start right away." The downpayment was also designed to prove Decker's sincerity, since "once this goes into effect—she's gonna be killed." Decker could barely contain his eagerness: "Well that's what I want[.] I don't want go to the hospital then come home. I want absolutely positively expired. Totally expired."

Decker and Holston met again at the golf course on September 7. This meeting was also videotaped and recorded. Decker gave Holston $5,000 in cash, wrapped in two plastic bundles. He reiterated that Holston, after Donna had been murdered, should use a pay phone to leave him a voicemail message—Holston was to say that "the paint job has been completed"—and that Holston would get the rest of the money about a month later. Decker also

reiterated that "if Hermine is in the car, with her, you cannot, I understand if I were in your business, I would never leave a witness. You have to take her out too. Whoever's with her you gotta take the other person out too. But don't charge me double."

Holston told Decker that he had already performed some intelligence work, that he was "convinced" he would see the victim the next day, and that he could get this "job" done quickly—eliciting another "marvelous" from Decker—and explained that "once I leave here, it's done. So, you sure you want to go through with it?" Decker replied, "I am absolutely, positively, 100 percent sure, that I want to go through with it. I've never been so sure of anything in my entire life. . . . [¶] [D]o it very fast . . . as fast as you can." At the end of the conversation, Decker seemed "very pleased" and thanked Holston and Wafer. A short time after Holston and Wafer drove off, Decker was arrested.

DISCUSSION

The superior court's dismissal of the attempted murder charges, which was based on undisputed facts, constitutes a legal conclusion subject to independent review on appeal. (*People v. Watson* (1981) 30 Cal.3d 290, 300 [179 Cal.Rptr. 43, 637 P.2d 279].) The question for us is whether "it appears from the preliminary examination that a public offense has been committed, 'and there is sufficient cause to believe the defendant guilty thereof . . . .' . . . ' "Sufficient cause" . . . means such a state of facts as would lead a man of ordinary caution or prudence to believe and conscientiously entertain a strong suspicion of the guilt of the accused [citation] . . . .' " (*Williams v. Superior Court* (1969) 71 Cal.2d 1144, 1147 [80 Cal.Rptr. 747, 458 P.2d 987].) "[E]vidence which will justify prosecution under the above test need not be sufficient to support a conviction." (*Ibid.*)

Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing. (Pen. Code, § 21a; *People v. Lee* (2003) 31 Cal.4th 613, 623 [3 Cal.Rptr.3d 402, 74 P.3d 176].) The uncontradicted evidence that Decker harbored the specific intent to kill his sister (and, if necessary, her friend Hermine) was overwhelming. Decker expressed to both Wafer and Holston his desire to have Donna killed. He researched how to find a hired assassin. He spent months accumulating cash in small denominations to provide the hired assassin with a downpayment and had also worked out a method by which to pay the balance. He knew the layout of his sister's condominium and how one might enter it surreptitiously. He had tested the level of surveillance in the vicinity of her home and determined it was "not really that sharp." He chronicled his sister's daily routine at both her home and her office. He

offered Holston recommendations on how his sister should be killed and what materials would be necessary. And, at both meetings with Holston, he insisted that Hermine, if she were present, be killed as well, so as to prevent her from being a witness.

The controversy in this case, as the parties readily concede, is whether there was also a direct but ineffectual act toward accomplishing the intended killings. For an attempt, the overt act must go beyond mere preparation and show that the killer is putting his or her plan into action; it need not be the last proximate or ultimate step toward commission of the crime or crimes (*People v. Kipp* (1998) 18 Cal.4th 349, 376 [75 Cal.Rptr.2d 716, 956 P.2d 1169]), nor need it satisfy any element of the crime (*People v. Dillon* (1983) 34 Cal.3d 441, 454 [194 Cal.Rptr. 390, 668 P.2d 697]). However, as we have explained, "[b]etween preparation for the attempt and the attempt itself, there is a wide difference. The preparation consists in devising or arranging the means or measures necessary for the commission of the offense; the attempt is the direct movement toward the commission after the preparations are made." (*People v. Murray* (1859) 14 Cal. 159; see also *People v. Anderson* (1934) 1 Cal.2d 687, 689–690 [37 P.2d 67].) " '[I]t is sufficient if it is the first or some subsequent act directed towards that end after the preparations are made.' " (*People v. Memro* (1985) 38 Cal.3d 658, 698 [214 Cal.Rptr. 832, 700 P.2d 446].)

As simple as it is to state the terminology for the law of attempt, it is not always clear in practice how to apply it. As other courts have observed, " '[m]uch ink has been spilt in an attempt to arrive at a satisfactory standard for telling where preparation ends and attempt begins.' [Citation.] 'Both as fascinating and as fruitless as the alchemists' quest for the philosopher's stone has been the search, by judges and writers, for a valid, single statement of doctrine to express when, under the law of guilt, preparation to commit a crime becomes a criminal attempt.' " (*Minshew v. State* (Ala.Crim.App. 1991) 594 So.2d 703, 709; accord, Perkins & Boyce, Criminal Law (3d ed. 1982) p. 617.) Indeed, we have ourselves observed that "none of the various 'tests' used by the courts can possibly distinguish all preparations from all attempts." (*People v. Memro, supra,* 38 Cal.3d at p. 699.)

■ Although a definitive test has proved elusive, we have long recognized that "[w]henever the design of a person to commit crime is clearly shown, slight acts in furtherance of the design will constitute an attempt." (*People v. Anderson, supra,* 1 Cal.2d at p. 690 [attempted robbery]; see also *People v. Memro, supra,* 38 Cal.3d at p. 698 [attempted lewd conduct]; *People v. Dillon, supra,* 34 Cal.3d at p. 455 [attempted robbery]; *People v. Morales* (1992) 5 Cal.App.4th 917, 926 [7 Cal.Rptr.2d 358] [attempted murder].) Viewing the entirety of Decker's conduct in light of his clearly

expressed intent, we find sufficient evidence under the slight-acts rule to hold him to answer to the charges of attempted murder. (See *People v. Memro, supra,* 38 Cal.3d at p. 699.)

Decker's plan was to get rid of his sister so that he could recover money that she owed him. He was concerned, however, that he would be considered an obvious suspect in her murder, so he sought out someone else to carry out his plan. To that end, he conducted research into the underworld of professional killers, he budgeted to pay for those services, he evaluated how and where the murder should be done, he tested the level of security around his sister's condominium, and he considered the possibility that there might be a witness and what should be done in that event. Once he met Detective Holston, whom he believed was a professional assassin, they agreed Holston would kill Donna and (if necessary) her friend Hermine, they agreed on a price, and they agreed it would be done within the week. Decker provided Holston with all of the necessary information concerning his sister, her home and office, and her habits and demeanor. He also gave Holston the agreed-on downpayment of $5,000 cash. Before he did, Holston warned him, "I want you to know, once I leave here, it's done. So, you sure you want to go through with it?" Decker replied, "I am absolutely, positively, 100 percent sure, that I want to go through with it. I've never been so sure of anything in my entire life."

■ Accordingly, at the time Decker handed Holston the downpayment on the murder, Decker's intention was clear. It was equally clear that he was " 'actually putting his plan into action.' " (*People v. Dillon, supra,* 34 Cal.3d at p. 453.) Decker had secured an agreement with Holston to murder Donna (and, if necessary, her friend Hermine); had provided Holston with all the information necessary to commit the crimes; had given Holston the $5,000 downpayment; and had understood that "it's done" once Holston left with the money. These facts would lead a reasonable person to "believe a crime is about to be consummated absent an intervening force"—and thus that "the attempt is underway." (*Id.* at p. 455.) Indeed, as Justice Epstein noted for the Court of Appeal, "[t]here was nothing more for Decker to do to bring about the murder of his sister." Although Decker did not himself point a gun at his sister, he did aim at her an armed professional who had agreed to commit the murder.[1]

As contrary authority, Decker relies on *Adami, supra,* 36 Cal.App.3d 452, which affirmed the dismissal of an attempted murder charge on similar facts, and relies also on the small number of out-of-state majority and minority

[1] Decker does not argue here that the attempted murder charges must be dismissed because, notwithstanding Decker's own conduct, Detective Holston never intended to commit the murders. (Cf. *People v. Camodeca* (1959) 52 Cal.2d 142, 147 [338 P.2d 903].)

opinions that have followed *Adami*. (See *Braham v. State* (Alaska 1977) 571 P.2d 631, 651 (conc. & dis. opn. of Connor, J.); *State v. Otto* (1981) 102 Idaho 250 [629 P.2d 646, 649]; see also *State v. Disanto* (S.D. 2004) 2004 SD 112 [688 N.W.2d 201, 208–209].) In *Adami*, the defendant sought to have his wife killed because she had stolen money from him. He agreed on a price with an undercover police agent posing as an assassin and supplied the agent with a photograph of the victim, a description of the victim and her residence and vehicles, and other pertinent information. The defendant gave the police agent $500 as a downpayment and announced he was not going to change his mind. (*Adami, supra,* 36 Cal.App.3d at pp. 454–455.) *Adami* declared that these acts "consisted solely of solicitation or mere preparation" and concluded, in accordance with the "weight of authority," that "solicitation alone is not an attempt." (*Id.* at p. 457.)

We perceive several flaws in *Adami*'s analysis.

First, the opinion makes no mention of the slight-acts rule, which has long been the rule for attempted crimes in California. Indeed, *Adami*'s progeny make no pretense of reconciling their analysis with the slight-acts rule and instead explicitly reject it. (E.g., *Braham v. State, supra,* 571 P.2d at p. 650 (conc. & dis. opn. of Connor, J.) ["Although there are a few cases in which courts have said that 'slight acts' will suffice for the more serious objectives, such as murder, the reasoning supporting these opinions is flawed in several ways"]; *State v. Otto, supra,* 629 P.2d at p. 649.) These cases thus conflict with well-established California law (see, *ante,* at p. 8; see generally 19 Cal.Jur.3d (2001) Criminal Law: Miscellaneous Offenses, § 18, p. 39) and with the law concerning attempted crimes in most jurisdictions. (22 C.J.S. (2006) Criminal Law, § 157, p. 214.)

Decker argues that the slight-acts rule should not be applied to the crime of attempted murder, but his argument lacks legal or logical support. Our adoption of the slight-acts rule in *People v. Anderson, supra,* 1 Cal.2d at page 690, was supported by a citation to *Stokes v. State* (1908) 92 Miss. 415 [46 So. 627, 629], which is "[o]ne of the leading cases in the United States on attempt to commit a crime" (*Duke v. State* (Miss. 1976) 340 So.2d 727, 729) and which (like the present case) involved a defendant who hired another to perform a murder. The cases on which Decker relies thus conflict not only with California law (see, e.g., *People v. Morales, supra,* 5 Cal.App.4th at p. 926), but also with the "fairly general agreement . . . that slight acts are enough when the intent to murder is clearly shown." (Annot., What Constitutes Attempted Murder (1974) 54 A.L.R.3d 612, 617–618.) Indeed, where (as here) the crime involves concerted action—and hence a greater likelihood that the criminal objective will be accomplished (*People v. Leon* (2007) 40 Cal.4th 376, 391 [53 Cal.Rptr.3d 524, 150 P.3d 207])—there

is a *greater* urgency for intervention by the state at an *earlier* stage in the course of that conduct. (*People v. Morante* (1999) 20 Cal.4th 403, 416, fn. 5 [84 Cal.Rptr.2d 665, 975 P.2d 1071].) Had Decker struck an agreement with and paid earnest money to a real hired killer, he could have been prosecuted for conspiracy to commit murder, which is punishable to the same extent as the completed crime of first degree murder. (See *People v. Hernandez* (2003) 30 Cal.4th 835, 870 [134 Cal.Rptr.2d 602, 69 P.3d 446].) Because of the fortuity that Decker's hired killer was actually an undercover detective, Decker faces the much less serious charge of attempted murder. Neither Decker nor the dissent has offered any reason for us to create an exception to the slight-acts rule for attempted murder, especially in *Stokes*'s classic formulation where the attempt involves concerted action with others, merely so that Decker's maximum potential punishment may be further reduced.

Second, *Adami* has misconceived the issue under these circumstances to be "whether the solicitation itself was sufficient to establish probable cause to believe that defendant attempted the murder." (*Adami*, *supra*, 36 Cal.App.3d at p. 455.) Decker similarly expends considerable effort to convince us that " 'solicitation of another to commit a crime is an attempt to commit that crime if, but only if, it takes the form of urging the other to join with the solicitor in perpetrating that offense, not at some future time or distant place, but here and now, and the crime is such that it cannot be committed by one without the cooperation and submission of another.' " (Quoting Perkins, Criminal Law (1957) p. 519; see also *Adami*, *supra*, 36 Cal.App.3d at p. 457.) But a solicitation requires only that a person invite another to commit or join in an enumerated crime (including murder) with the intent that the crime be committed. (Pen. Code, § 653f.) The solicitation is complete once the request is made (*People v. Burt* (1955) 45 Cal.2d 311, 314 [288 P.2d 503]) and is punishable "irrespective of the reaction of the person solicited." (*In re Ryan N.* (2001) 92 Cal.App.4th 1359, 1377 [112 Cal.Rptr.2d 620].) In this case, the solicitation was complete early in Decker's first conversation with Holston, when he asked Holston to kill Donna. But the People do not contend that this request was sufficient to prosecute Decker for attempted murder. They argue instead that the solicitation, in combination with Decker's subsequent conduct, revealed his plan to have Holston murder Donna (and, if necessary, her friend Hermine) and that Decker put this plan into operation no later than the point at which he completed the agreement with Holston, finalized the details surrounding the murders, and paid Holston $5,000 in earnest money.

The issue, then, is not whether "solicitation alone" is sufficient to establish an attempt (*Adami*, *supra*, 36 Cal.App.3d at p. 457) but whether a solicitation to commit murder, combined with a completed agreement to hire a professional killer and the making of a downpayment under that agreement, can establish probable cause to believe Decker attempted to murder these victims.

A substantial number of our sister states have held that it can. (E.g., *State v. Mandel* (1954) 78 Ariz. 226 [278 P.2d 413, 415–416];[2] *Howell v. State* (1981) 157 Ga.App. 451 [278 S.E.2d 43, 46–48]; *State v. Montecino* (La.Ct.App. 2005) 906 So.2d 450, 454; *State v. Manchester* (1983) 213 Neb. 670 [331 N.W.2d 776, 780]; *State v. Kilgus* (1986) 128 N.H. 577 [519 A.2d 231, 235–236]; *People v. Sabo* (N.Y.Sup.Ct. 1998) 179 Misc.2d 396 [687 N.Y.S.2d 513, 519–520]; *Ashford v. Com.* (2006) 47 Va.App. 676 [626 S.E.2d 464, 467–468]; *State v. Gay* (1971) 4 Wn.App. 834 [486 P.2d 341, 345–346]; *State v. Burd* (1991) 187 W.Va. 415 [419 S.E.2d 676, 680]; see also *United States v. Martinez* (2d Cir. 1985) 775 F.2d 31, 35; *United States v. Church* (C.M.A. 1991) 32 M.J. 70, 73.) Additional jurisdictions have held that a solicitation to murder, in combination with a completed agreement to hire a professional killer and further conduct implementing the agreement, can similarly constitute an attempted murder. (E.g., *Braham v. State, supra,* 571 P.2d at p. 638 [completed agreement, plus a visit by the hired killer to the victim to "foster[] a relationship of trust and confidence"]; *State v. Group* (2002) 98 Ohio St.3d 248 [2002 Ohio 7247, 781 N.E.2d 980, 996] ["Group did more than merely solicit the firebombing of Mrs. Lozier's house. He took all action within his power, considering his incarceration, to ensure that the crime would be committed"].) We find these authorities persuasive.

■ Third, *Adami* mistakenly assumes that there can be no overlap between the evidence that would tend to prove solicitation to murder and that which would tend to prove attempted murder. Indeed, Decker asserts that these are "mutually exclusive crimes." But it could not be plainer, as Chief Justice Holmes put it, that while "preparation is not an attempt," nonetheless "*some* preparations may amount to an attempt." (*Commonwealth v. Peaslee* (1901) 177 Mass. 267 [59 N.E. 55, 56], italics added.) Conduct that qualifies as mere preparation and conduct that qualifies as a direct but ineffectual act toward commission of the crime exist on a continuum, " 'since all acts leading up to the ultimate consummation of a crime are by their very nature preparatory.' " (*State v. Sunzar* (1999) 331 N.J. Super. 248 [751 A.2d 627, 630], quoting *State v. Otto, supra,* 629 P.2d at p. 653 (dis. opn. of Bakes, C. J.).) The difference between them "is a question of degree." (*Commonwealth v. Peaslee, supra,* 59 N.E. at p. 56.) There is thus

[2] The dissent purports to distinguish *State v. Mandel, supra,* 278 P.2d 413, which upheld a conviction for attempted murder following a downpayment, on the ground that Mandel, after being introduced to the undercover agent posing as a hired killer, explained how the murder should take place and drove the agent in a car to view the victim's home and the site for disposal of the body (dis. opn., *post,* at p. 17, fn. 5), whereas defendant here, after being introduced to the undercover agent posing as a hired killer, explained how the murder should take place and communicated the victim's address and other information in both written and oral form to the undercover agent in a parking lot. The dissent's rationale for endowing the location of the communication with determinative legal significance is, at best, elusive.

no error in resting a finding of attempted murder in part on evidence that *also* tends to establish solicitation to commit murder and vice versa. (*State v. Kilgus, supra,* 519 A.2d at p. 236 ["whether the defendant's actions constituted solicitation was not important so long as his actions also constituted an attempt"].) After all, even under Decker's analysis, evidence of a solicitation to commit murder can tend to support a finding of attempted murder if the defendant then "provides the hit man the instrument or other means to procure the death." (See also *Adami, supra,* 36 Cal.App.3d at p. 457.)[3] Decker offers no principled basis for a different result when the hit man already has a weapon and the defendant instead begins payment under the contract to kill.

  ▮ Fourth, we reject the contention, endorsed by Decker and by *Adami's* progeny, that there is "no persuasive reason" why a solicitation to commit murder "should be treated differently under the law merely because part of the agreed upon fee has passed hands. There is no greater proximity, no significantly greater likelihood of consummation, and no act of a nature other than incitement or preparation inherent in the solicitation itself." (*State v. Otto, supra,* 629 P.2d at p. 650.) As the People point out, though, a downpayment on a contract to murder serves the same purpose as a downpayment on any other type of contract. It evidences the solicitor's "seriousness of purpose" and makes the object of the contract "closer to fruition." (*State v. Molasky* (Mo. 1989) 765 S.W.2d 597, 602; cf. *Johnson v. Sheriff* (1975) 91 Nev. 161 [532 P.2d 1037, 1038] [no downpayment was offered to the would-be killer].) It blinks reality to equate the threat posed by an individual who has merely invited another, perhaps unsuccessfully, to commit murder with the threat posed by an individual who has already reached an agreement with a hired killer to commit murder, finalized the plans, and made the downpayment under the contract to kill. But for Holston's status as an undercover detective, it is likely that Decker's conduct would have resulted in the murder of these victims. Where, as here, the defendant's intent is unmistakable, " 'the courts should not destroy the practical and common-sense administration of the law with subtleties as to what constitutes preparation and what constitutes an act done toward the commission of a crime.' " (*People v. Memro, supra,* 38 Cal.3d at p. 698.)

  The purpose of requiring an overt act is that until such act occurs, one is uncertain whether the intended design will be carried out. When, by reason of the defendant's conduct, the situation is "without any equivocality," and it appears the design will be carried out if not interrupted, the defendant's conduct satisfies the test for an overt act. (*People v. Miller* (1935) 2 Cal.2d

---

  [3] The dissent apparently would part company with defendant and *Adami* on this point, inasmuch as hiring a killer and providing the killer with a weapon likewise "only highlights [defendant's] intention not to perform the act himself." (Dis. opn., *post,* at p. 15.)

527, 532 [42 P.2d 308]; accord, *State v. Mandel, supra,* 278 P.2d at p. 416.) Here, the record supported at least a strong suspicion that Decker's intent to have his sister (and, if necessary, her friend) murdered was unambiguous and that he had commenced the commission of the crime by doing all that he needed to do to accomplish the murders.

■ In finding the record sufficient to hold Decker to answer to the charges of attempted murder here, we do not decide whether an agreement to kill followed by a downpayment is *always* sufficient to support a charge of attempted murder. Whether acts done in contemplation of the commission of a crime are merely preparatory or whether they are instead sufficiently close to the consummation of the crime is a question of degree and depends upon the facts and circumstances of a particular case. (*Braham v. State, supra,* 571 P.2d at p. 637; *Stokes v. State, supra,* 46 So. at p. 628.) A different situation may exist, for example, when the assassin has been hired and paid but the victims have not yet been identified. In this case, however, Decker had effectively done all that he needed to do to ensure that Donna and her friend be executed. (*State v. Mandel, supra,* 278 P.2d at p. 416; *State v. Kilgus, supra,* 519 A.2d at p. 236; *People v. Sabo, supra,* 687 N.Y.S.2d at p. 520; *Ashford v. Com., supra,* 626 S.E.2d at pp. 467–468; *State v. Gay, supra,* 486 P.2d at pp. 345–347; see also *United States v. Martinez, supra,* 775 F.2d at p. 35.) Accordingly, he should have been held to answer to the charges of attempted murder. We disapprove *People v. Adami, supra,* 36 Cal.App.3d 452, to the extent it is inconsistent with this opinion.

### DISPOSITION

The judgment of the Court of Appeal is affirmed.

George, C. J., Kennard, J., Chin, J., Moreno, J., and Corrigan, J., concurred.

**WERDEGAR, J.,** Dissenting.—My colleagues hold that defendant's conduct in soliciting the murder of his sister, reaching an agreement with a hired assassin to do the killing, and making a downpayment under the agreement establishes probable cause to believe defendant himself attempted the murder. I respectfully dissent. "An attempt to commit a crime consists of two elements: a specific intent to commit the crime, and a direct but ineffectual act done toward its commission." (Pen. Code, § 21a.) Defendant's conduct in this case does not include "a direct but ineffectual act" done toward the murder's commission. Accordingly, he cannot be guilty of attempted murder.

As we have long recognized, the required act for an attempt under California law must be "directed towards immediate consummation"

(*People v. Dillon* (1983) 34 Cal.3d 441, 454 [194 Cal.Rptr. 390, 668 P.2d 697]) of the crime attempted. As the majority details, defendant's conduct included numerous *indirect* acts toward accomplishing the murder of his sister: he sought the services of a hired assassin; he located a person (actually an undercover police detective) he thought would act as such; he furnished the supposed assassin with a description of his sister, her home, her car and her workplace, as well as specific information concerning her daily habits; he discussed how the murder would be done and how and when he would pay for the work, agreeing to furnish $5,000 in cash as a downpayment; and, finally, just before he was arrested, he stated he was "absolutely, positively, 100 percent sure, that I want to go through with it" and urged the supposed assassin to do it "as fast as you can."

I agree with the majority that as evidence defendant harbored the specific intent to kill his sister, these facts are overwhelming. None of them, however, constitutes a *direct* but ineffectual act done toward the murder's commission. (Pen. Code, § 21a.) As the majority states, defendant "did not himself point a gun at his sister" (maj. opn., *ante*, at p. 9); neither did he otherwise directly menace her. Instead, he relied on the person he thought had agreed to commit the murder to do the actual deed.[1] The direct object of defendant's preparatory acts was the person he sought to engage as his agent—not the ultimate, intended victim of the scheme.

We previously have stated that for attempt, it must be "clear from a suspect's acts what *he* intends to do . . . ." (*People v. Dillon, supra*, 34 Cal.3d at p. 455, italics added.) In this case, what defendant intended to do was have his sister killed *by someone else*. Defendant's own conduct did not include even "slight" acts toward actual commission of the murder. That he hired another, supplied him with information, and paid him a downpayment only highlights his intention not to perform the act himself.

The California cases the majority purports to rely on generally involve single actors, i.e., defendants who acted directly on their victims.[2] These

---

[1] Although the majority asserts defendant "did aim at [his sister] an armed professional who had agreed to commit the murder" (maj. opn., *ante*, at p. 9), the armed professional referred to (i.e., the detective) only *pretended* to agree so that in fact there was no agreement, though defendant thought there was. This absence of actual agreement presumably is why the case was not prosecuted as a conspiracy. (See *People v. Jurado* (2006) 38 Cal.4th 72, 120 [41 Cal.Rptr.3d 319, 131 P.3d 400] [" 'A conviction of conspiracy requires proof that the defendant and another person had the specific intent to agree or conspire to commit an offense, as well as the specific intent to commit the elements of that offense, together with proof of the commission of an overt act "by one or more of the parties to such agreement" in furtherance of the conspiracy' "].)

[2] See, e.g., *People v. Memro* (1985) 38 Cal.3d 658, 699 [214 Cal.Rptr. 832, 700 P.2d 446] (ushering a boy into a room and standing close by during a strobe display were direct acts

cases simply confirm that for attempt a defendant must have committed a direct act toward commission of the crime. Defendant here committed no direct act toward commission of the murder, since his scheme interposed a third party between himself and his intended victim, and the third party never acted. The majority goes astray in applying to this solicitation-of-murder case, where action by another person was required to effectuate (or attempt) the intended killing, principles applicable when an offense is intended and attempted by a single individual.

Although defendant's conduct went beyond the minimum required for solicitation, for purposes of attempt law his arrangements constitute mere preparation. Reprehensible as they were, his acts "did not amount to any more than the mere arrangement of the proposed measures for [the] accomplishment" of the crime. (*People v. Adami* (1973) 36 Cal.App.3d 452, 457–458 [111 Cal.Rptr. 544].) This is because, as a logical matter, they did no more than "leave the intended assailant only in the condition to commence the first direct act toward consummation of the defendant's design." (*Id.* at p. 458.) To do all one can to motivate and encourage another to accomplish a killing—even to make a downpayment on a contract to kill—while blameworthy and punishable, is neither logically nor legally equivalent to attempting the killing oneself. In concluding to the contrary, the majority blurs the distinction between preparation and perpetration the Legislature intended by requiring that an attempt include a direct act. (Pen. Code, § 21a.) The majority's supportive reasoning likewise conflates the two separate elements of attempt, specific intent and direct act (*ibid.*): "Viewing the entirety of [defendant's] conduct *in light of his clearly expressed intent*, we find sufficient evidence under the slight-acts rule to hold him to answer to the charges of attempted murder." (Maj. opn., *ante*, at pp. 8–9, italics added.)[3] As a court, we are not authorized to ignore the statutory requirements.

sufficient for the attempted commission of a lewd or lascivious act on a minor); *People v. Dillon, supra*, 34 Cal.3d at page 456 (arriving on land armed and disguised, and dividing into groups to encircle a field, were direct acts sufficient for the attempted robbery of a marijuana farm); *People v. Anderson* (1934) 1 Cal.2d 687, 690 [37 P.2d 67] (approaching a ticket office and pulling out a gun were direct acts sufficient for the attempted armed robbery of a theater); *People v. Morales* (1992) 5 Cal.App.4th 917, 926–927 [7 Cal.Rptr.2d 358] (threatening twice to "get" the victim, going home, loading a gun, driving to the victim's neighborhood, and hiding in a position with a clear shot were direct acts sufficient for attempted murder).

[3] The majority casts its holding so circumstantially as to undercut any guidance this case might provide in future cases. As the majority states, in finding the record sufficient to hold defendant to answer to the charges of attempted murder, it does "not decide whether an agreement to kill followed by a downpayment is *always* sufficient to support a charge of attempted murder. Whether acts done in contemplation of the commission of a crime are merely preparatory or whether they are instead sufficiently close to the consummation of the crime is a question of degree and depends upon the facts and circumstances of a particular case." (Maj. opn., *ante*, at p. 14.)

The majority's criticisms of *People v. Adami, supra,* 36 Cal.App.3d 452, are unpersuasive. The majority faults *Adami* for not mentioning the slight acts rule, but since the *Adami* court concluded no "appreciable fragment of the crime charged was accomplished" (*id.* at p. 457), the rule had no application. Nor, contrary to the majority's account, did *Adami* assume that evidence of solicitation cannot also be evidence of attempt. *Adami* simply held that hiring a murderer, planning the murder, and making a downpayment logically constitute "solicitation or mere preparation" (*ibid.*), not attempted murder.

Confronted with statutory language and judicial precedent contrary to its conclusion, the majority relies on out-of-state cases. Several of these interpret attempt statutes distinguishable from our own.[4] Others involve more than a completed agreement with a hired killer, including a direct act *toward the victim.*[5] The remaining cases are in my view mistaken for the same reason the majority is mistaken: they implicitly allow that a defendant may be guilty of attempt when no direct act toward the commission of the crime has been done.[6] Courts in some other jurisdictions have, as the majority fails to acknowledge, maintained the distinction between preparation and attempt in cases similar to this.[7]

---

[4] See, e.g., *United States v. Martinez* (2d Cir. 1985) 775 F.2d 31, 35 ("conduct amounting to a 'substantial step' towards the commission of the crime"); *United States v. Church* (C.M.A. 1991) 32 M.J. 70, 71 ("an act . . . amounting to more than mere preparation"); *Howell v. State* (1981) 157 Ga.App. 451 [278 S.E.2d 43, 46] (" 'substantial step toward the commission of that crime' "); *State v. Molasky* (Mo. 1989) 765 S.W.2d 597, 600 (noting "[a]n act of perpetration [is] no longer required, and instead a defendant need only do an act which [is] a 'substantial step' toward commission"); *State v. Manchester* (1983) 213 Neb. 670 [331 N.W.2d 776, 780] (" 'conduct which is a substantial step ' "); *State v. Gay* (1971) 4 Wn.App. 834 [486 P.2d 341, 345] (" 'act . . . tending but failing to accomplish' " the crime).

[5] See, e.g., *State v. Mandel* (1954) 78 Ariz. 226 [278 P.2d 413, 415–416] (defendant planned to entice victim to murder scene and drove assassin in her car to view victim's home and arroyo where body was to be disposed of); *State v. Kilgus* (1986) 128 N.H. 577 [519 A.2d 231, 234–236] (defendant said he was "going to have to get involved" and made arrangements for the victim to be alone); *State v. Burd* (1991) 187 W.Va. 415 [419 S.E.2d 676, 680] (defendant offered to drive the assassin to show him the victim's house and provided a fake suicide note to leave at the crime scene and money for a gun).

[6] See, e.g., *State v. Montecino* (La.Ct.App. 2005) 906 So.2d 450, 454; *Ashford v. Com.* (2006) 47 Va.App. 676 [626 S.E.2d 464, 467–468].

[7] See, e.g., *People v. Otto* (1981) 102 Idaho 250 [629 P.2d 646, 648]; *Johnson v. Sheriff* (1975) 91 Nev. 161 [532 P.2d 1037, 1038]; *State v. Disanto* (2004) 2004 SD 112 [688 N.W.2d 201, 213].

Had the supposed assassin hired to kill defendant's sister actually attempted to kill her, defendant would be punishable under Penal Code section 31 as a principal in the offense, either as an aider and abettor or as a coconspirator.[8] But in this case, neither defendant nor the supposed assassin took a direct act toward commission of the offense. Defendant's conduct was confined to encouraging and enabling his intended agent to kill (or attempt to kill), but the detective with whom he dealt took no such action. There was no attempt.

For the foregoing reasons, I dissent.

---

[8] Penal Code section 31 states that "[a]ll persons concerned in the commission of a crime, . . . whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission . . . are principals in any crime so committed."