Filed 7/15/16  P. v. Luker CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>DANIEL BRIAN LUKER,<br><br>    Defendant and Appellant. | G050575<br><br>(Super. Ct. No. 13CF3953)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Daniel Barrett McNerney, Judge.  Affirmed as modified.

David P. Lampkin, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland, Scott C. Taylor and Teresa Torreblanca, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Daniel Brian Luker of conspiracy to commit murder, premeditated attempted murder, solicitation to commit murder, and active participation in a criminal street gang. The jury found true allegations Luker committed the crimes for the benefit of, at the direction of, or in association with, a criminal street gang. Luker admitted three prior strike convictions, and one prior serious felony conviction. The court sentenced him to a total indeterminate term of 80 years to life, to be served consecutive to a 16-year sentence imposed in another case.

Luker asserts the convictions improperly rest on the uncorroborated testimony of his accomplice, and he challenges the sufficiency of the evidence to prove attempted murder. We reject these arguments. However, the parties agree the court should have awarded Luker 30 days presentence custody credits under Penal Code section 2933.1. The judgment is modified to reflect a presentence custody credit award of 203 actual days and 30 days conduct credit. As modified, the judgment is affirmed.

**FACTS**

*Background*

In 2012, Luker, also known as Caveman, was a shot caller in the La Mirada Punks (LMP), a White racist criminal street gang. Breanna (also known as Bree) Chacon, Luker's then-girlfriend, was an LMP associate. Chacon had cooperated with law enforcement during an investigation into Luker's narcotics and gang activities. The investigation led to Luker's conviction and incarceration for possession of narcotics with a gang enhancement.

Around October 2, 2013, Daniel Garretto, an LMP gang member, contacted La Mirada Police Detective Nick Wilson. Wilson had been a witness in Luker's narcotics prosecution. Wilson knew Luker, Chacon, and Garretto from previous criminal investigations.

Garretto had been Luker's cellmate for a few months earlier in the year, and he told Wilson he had some information. Wilson and other law enforcement officers

2

interviewed Garretto at least twice between October 2 and 20, and once in January 2014, in the La Miranda Police Department interview room.

Garretto told police Luker had asked him to do a couple of favors when he got out of jail. Luker gave Garretto a letter to Chacon, a piece of paper with names, phone numbers, dollar amounts, and notes, written on both sides, and a directive to tell Bam Bam, another LMP gang member, to give Chacon a hot shot.

Based on his training and experience, Wilson knew a hot shot was a hypodermic syringe filled with drugs or toxic chemicals, and he became concerned for Chacon's safety.

The letter to Chacon warned her about being an informant. Although Luker claimed to have been protecting Chacon from retribution for her cooperation with police, he also told her there had been talk amongst the LMP members in jail, "regarding you on Dev's paperwork. I refused to show mine, only Speedy had seen it. Because I felt he knew you and would give me his honest opinion . . . . The outcome was that we all agreed you were LMP, one of ours, and you are my wife, so I don't want *nothing* to happen to you. I don't want anything to happen to you right now ever. Speedy backed my decision. Now Speedy is very pissed cause you lied to him about everything and he has been showing his paperwork around. Warlock also has something on you from your case, then Luck . . . ."

Luker also wrote, "All of this stuff you keep pulling has gotten a green light on you by PENI, OCS, AB, now Emme will get involved if your [*sic*] involving a Mexican. Do you have a clue what you are doing? Do I need to keep denying your [*sic*] no good to everyone, my ass is in deep shit already from this . . . . I can't respond to kites, until I hear from you, you are making it worse." And, he said, "The word on the streets is that you [*sic*] with/were with a Mexican named Cowboy, and you are not under the LMP umbrella or my wife any longer. I need to know the truth from you."

After reading the letter, Wilson became even more concerned. He knew that when someone in a gang is green lighted it means they have been targeted for severe punishment, or death.

The piece of paper Garretto showed Wilson listed names and dollar amounts, like a pay-owe sheet. Garretto told Wilson he was supposed to collect the dollar amounts for Luker, so Luker could have some money to spend in jail. But, the paper also had a list of LMP gang monikers and phone numbers, and in the margin next to this list, someone had drawn three asterisks and written, "get cop[ie]s of Bree P.W." On the reverse side, someone had written, "Bree," a phone number, with the notation, "Bree B.F.?" and "Cowboy" and a phone number. Wilson thought P.W. stood for paperwork, or documents related to a court case.

*Luker's Phone Calls*

Orange County Sheriff's Investigator William Beeman, an eight-year-veteran of the department's special operations unit, routinely gathers information connected to White racist gang members, or associates, and he passes this information to law enforcement agencies and potential crime victims.

One method of intelligence gathering involves a phone system called Global Telelink, GTL, which records almost every phone call made from the Orange County jail. Beeman has ready access to these recordings for up to a year. Plus, he has the ability to listen in real time. Jail calls are forwarded to Beeman's cell phone.

During the evening of October 22, Luker called Shantell Apodoca, another LMP member, or associate. Luker told Apodoca his cellmate was about to be released, and he would have some important paperwork for her.

After the call, Beeman had a deputy search Luker's cellmate, Joe Miller, for paperwork against Chacon. The search turned up a copy of a transcript from an interview Beeman had with Chacon on March 30, 2012. The transcript records Chacon's

4

complaints about getting "wrapped up in everything." Further, she had recently discovered that Luker lied to her, and she was starting to feel used and angry.

Beeman called Apodoca and purported to be Miller. Within a few hours, he and Wilson were at Apodoca's residence. Apodoca told the officers Chacon was a known rat, or police informant. She also said her instructions were to get the paperwork from Luker and "pass them out to the homeboys." Apodoca confirmed LMP had green lighted Chacon. The following day, Apodoca agreed to assist law enforcement.

In preparation for trial, Beeman reviewed hours of recorded phone calls from the previous months. In all, Beeman found 15 calls relevant to Luker's case. From these calls, Beeman prepared a 52-minute CD for presentation to the jury.

In September, Luker called and complained to a gang member, because no one would tell him if Chacon had a boyfriend. He threatened to remove his protection over Chacon if she was seeing someone else.

Luker called Chacon's aunt, another long-time LMP member or associate. He complained to the aunt about Chacon's refusal to talk to him, and her new man. The aunt commiserated. She said, "Right now Breanna is in her own little world, she's doing what Breanna wants to do, and she don't give a fuck about nobody at all, right now except Breanna." Luker said, "Breanna is in a lot of trouble," because people had heard about her being an informant, and there were several other gangs looking for her. Chacon's aunt said, "I'm so afraid she's gonna get a 'hot shot.'" Luker agreed, but said he wanted to help protect Chacon.

On September 26, Luker phoned Garretto. He asked for a status update on Chacon, and he gave Garretto messages from other gang members about her. Luker said he had the paperwork ready, but he wanted to talk to Chacon before he released it. He denied saying he wanted to "whack" Chacon, but he also said he would send out her paperwork if Chacon did not contact him. Luker said he was trying to help Chacon, and he needed to talk to her.

5

Luker next called Chacon, professed his love, and asked if Chacon was still his wife. She reluctantly said yes, but she expressed anger over some letters Luker had sent to Apodaca. Luker repeatedly asked if she was seeing someone else. Chacon denied any other relationship.

The next day, Luker phoned Garretto. He, again, asked for a status update on Chacon. Garretto said he thought everything was fine and he had no news. Luker said, "People are getting stabbed over this shit, because of Bree." He told Garretto to "take care of this shit" before Garretto got arrested and re-incarcerated.

Luker also called Laurie Irwin, from whom he learned Chacon was seeing Steven Cervantes, also known as "Cowboy." Luker said the news broke his heart. He mentioned a rumor that he had asked Bam Bam to hurt Chacon, but said it was not true. Luker also wanted Chacon to know he had gotten in trouble trying to help her. He said at least eight people he knew, including Bam Bam, and four or five other gangs, wanted to "get" Chacon. Irwin said she also knew people that wanted to "get" Chacon. Irwin told Luker that Apodoca was just waiting for his call.

Luker called Apodoca on October 21. He told Apodoca that Chacon had informed on other people. Apodoca said, "It figures, right?" Luker said he knew about 10 people who were after her. Apodoca responded, "It's showtime." Luker laughed and replied, "I love you mama." Apodoca asked about "putting her out there." Luker responded that something had happened in jail he could not talk about, but a friend was getting out of jail in a day or two and he would give Apodoca a message.

*Garretto's Trial Testimony*

Garretto pled guilty to conspiracy to murder Chacon, and he agreed to testify against Luker in exchange for probation, and 10 months in custody. In 2013, he was an active participant of LMP. However, his ties to the gang were permanently severed with his testimony. The gang now considers him a rat, and he lives in fear for his life.

6

Garretto testified Luker talked about his relationship with Chacon when they were cellmates. Luker went from love to hate after he discovered Chacon was dating Cowboy. Luker asked Garretto to do several favors for him right before Garretto was released from custody. Luker wanted Garretto to collect some debts so he could have spending money in jail, and deliver a love letter to Chacon. However, he also wanted Garretto to deliver paperwork on Chacon, which Garretto knew meant Chacon was a police informant, and he asked Garretto to deliver a message to Bam Bam in Lakewood. Luker directed Garretto to contact Bam Bam and tell Bam Bam to give Chacon a "hot shot."

Garretto did not deliver the letter, nor did he collect any debts. Garretto did talk to Bam Bam. Garretto told Bam Bam, "Caveman asked me to tell you to give Bree a hot shot."

*Apodoca*

Apodoca was given immunity in exchange for her cooperation. She explained that "paperwork" (court documents or police reports) shows a person is a snitch or a rat, and there are sometimes deadly consequences for being one. Apodoca said Chacon had been "green lighted," which means she had been targeted for death or serious injury.

After Luker called her on October 22, Apodoca was supposed to distribute copies of Chacon's paperwork to other LMP gang members. She was willing to do this for Luker, even though she knew it could result in Chacon's death, or serious injury. But, Apodoca decided to cooperate with police when they mentioned she could be charged with conspiracy to murder Chacon.

When police officers came to Apodoca's house after the October 22 call, they seized five letters Luker wrote to Apodoca during October. In the letters, Luker repeatedly professes his love for Apodoca, and his intense anger at Chacon and the "dude [she] runs around with." He once described Chacon and her man as the "perfect scumbag

7

couple." Luker asked Apodoca to "[s]et up Bree for me [smiley face]." And, he let her know he had "all Bree[']s paperwork ready to send out to you on the streets . . . ."

*Gang Expert Testimony*

Orange County Sheriff's Deputy Don Monteleone testified as the prosecution's gang expert. Monteleone said LMP is a White racist criminal street gang with a few Hispanic members. In October 2013, LMP had "over 50 members and associates and over 25 active participants." LMP's primary activities are drug sales, weapons violations, and vehicle thefts.

Monteleone testified about two predicate crimes. In 2005, an active LMP member pled guilty to assault by means of force likely to produce great bodily injury with a gang enhancement, and another active member pled guilty to firearms violations with a gang enhancement.

In Monteleone's expert opinion, if a female gang associate is a known police informer, and she starts having paperwork distributed, there will be trouble. If a gang shot caller puts a green light on someone, and he asks a gang member to contact another gang member with directions to give the female gang associate a hot shot, these actions would be for the benefit of the gang, and would be done with intent to promote, benefit, and assist criminal conduct.

## DISCUSSION

*1. Accomplice Testimony*

Luker argues the prosecution failed to adequately connect him to the crimes, independently of Garretto's testimony. We disagree. Garretto and Apodoca were accomplices as a matter of law. (See *People v. Riggs* (2008) 44 Cal.4th 248, 312.) Penal Code section 1111 states, "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof."

8

However, "'Corroborating evidence may be slight, entirely circumstantial, and entitled to little consideration when standing alone. [Citations.] It need not be sufficient to establish every element of the charged offense or to establish the precise facts to which the accomplice testified. [Citations.] It is "sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth." [Citation.]' [Citation.]" (*People v. Manibusan* (2013) 58 Cal.4th 40, 95.)

In this case, prosecution witnesses explained LMP and the culture and behavior of criminal street gangs. Shot callers direct gang activity. Police informers are called rats, and rats are singled out for acts of violent retribution. When someone is green lighted, they have been marked for death, or serious injury, and a hot shot is one way to accomplish both. These facts are established independent of Garretto.

With this background, Luker's calls and letters reveal knowledge of Chacon's informant status, her new boyfriend, and his anger over both situations. As an LMP shot caller, Luker talked to other LMP members about sending out paperwork on Chacon, and he had a transcript of one of Wilson's interviews with Chacon in his cell. Sending out paperwork on a gang member and green lighting them is the equivalent of a death threat. Chacon's aunt expressed the fear someone would give Chacon a hot shot, so the prosecution did not need Garretto's testimony about the hot shot to link Luker to a conspiracy to commit Chacon's murder, and attempted murder. In any event, Garretto's testimony was amply corroborated by other evidence in the record.

2. *Sufficiency of the Evidence to Prove Attempted Murder*

"Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing. [Citations.]" (*People v. Superior Court* (*Decker*) (2007) 41 Cal.4th 1, 7.) Luker argues the prosecution failed to prove he made a direct but ineffectual act toward murdering Chacon, and his conviction for attempted murder offends due process. Again we disagree.

9

When addressing challenges to the sufficiency of the evidence, the reviewing court evaluates the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*Jackson v. Virginia* (1979) 443 U.S. 307, 318-319; *People v. Story* (2009) 45 Cal.4th 1282, 1296; *People v. Johnson* (1980) 26 Cal.3d 557, 578.)

We accept any logical inferences the jury could have drawn from the circumstantial evidence because the jury, not the reviewing court, must be convinced of the defendant's guilt beyond a reasonable doubt. (*People v. Zamudio* (2008) 43 Cal.4th 327, 357-358.) "If the circumstances, plus all the logical inferences the jury might have drawn from them, reasonably justify the jury's findings, our opinion that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment. [Citations.]" (*People v. Tripp* (2007) 151 Cal.App.4th 951, 955.)

What constitutes a direct but ineffectual act toward the commission of a crime has been a matter of some debate. "Although a definitive test has proved elusive, we have long recognized that '[w]henever the design of a person to commit crime is clearly shown, slight acts in furtherance of the design will constitute an attempt.' [Citations.]" (*Decker*, *supra*, 41 Cal.4th at p. 8.)

In the present case Luker, an LMP shot caller, talked to other LMP members about Chacon. He green lighted her, which meant other gang members may kill her without retribution, and with full knowledge of the probable ramifications, Luker distributed evidence of Chacon's complicity with the police in the prosecutions of several LMP members. And, just in case distributing paperwork proved unfruitful, Luker also arranged for Chacon to die by a hot shot. As noted, Apodoca said she was just waiting for Luker's call for it to be, "show time."

10

Considering the evidence about LMP, street gang subculture, Luker's letters and phone calls, and the accomplice testimony, there is substantial evidence Luker took direct, but ineffectual, acts in furtherance of his intent to kill Chacon.

*3. Presentence Custody Credits*

The parties agree the court should have granted Luker 30 days conduct credit under Penal Code section 2933.1. (See *People v. Cortez* (1998) 18 Cal.4th 1223, 1237-1238; *People v. Jacobs* (2013) 220 Cal.App.4th 67, 85.) We agree to and modify the abstract of judgment accordingly.

## DISPOSITION

The clerk of the superior court is directed to modify the abstract of judgment to reflect an award of 203 days custody credit and 30 days conduct credit under Penal Code section 2933.1, and too forward a copy to the Department of Corrections and Rehabilitation. As modified, the judgment is affirmed.

THOMPSON, J.

WE CONCUR:

BEDSWORTH, ACTING P. J.

FYBEL, J.

11