340 So.2d 727 (1976)
Glenn DUKE
v.
STATE of Mississippi.
No. 49256.
Supreme Court of Mississippi.
December 7, 1976.
Rehearing Denied January 12, 1977.
*728 Richard E. Stratton, III, Allen & Allen, Robert O. Allen, Brookhaven, for appellant.
A.F. Summer, Atty. Gen., by Karen Gilfoy, Asst. Atty. Gen., Jackson, for appellee.
Before GILLESPIE, C.J., and SUGG and BROOM, JJ.
SUGG, Justice, for the Court:
Glenn Duke was convicted of attempted murder of B.E. Fisher and sentenced to ten years in the penitentiary by the Circuit Court of the First Judicial District of Hinds County.
Duke and Fisher were the owners of Glenn Duke Mobile Homes, Inc. Fisher furnished the capital and Duke operated the business. Duke hired Robert Samuelson in March, 1974 to manage a mobile home lot owned by the corporation. Samuelson testified that in August, 1974, Duke approached him with the idea of eliminating Fisher. The suggestion was repeated by Duke several times after the original proposal. Samuelson doubted at first that Duke was serious about eliminating his partner, but pretended to go along with the idea provided Duke would arrange a hunting trip so that the killing would appear to be an accident. The trip was set up and Samuelson, in the presence of Duke, pointed his shotgun at Fisher and faked a misfiring. Duke asked him to try again and approached Samuelson about making another effort to kill Fisher, but Samuelson stated he would have to put it off for a while. By this time Samuelson was no longer employed by Duke, having moved to Fort Worth, Texas in January, 1975. About a week after he moved Duke approached him about finding someone in Texas to kill Fisher. During the month of January, Duke talked to Samuelson by telephone several times about the matter and Samuelson, realizing the seriousness of the situation, agreed to put out feelers for a hitman. He told Fisher about the plan and then notified Duke that he had found someone to handle the job for $15,000 but Fisher would have to come to the Fort Worth area. Duke agreed and stated that since Fisher had planned a trip to the Dallas-Fort Worth area to buy a boat, he would be able to have Fisher come to Texas.
During the interim Duke approached the Internal Revenue Service and talked to Bobby Joe Hudson, a special agent in the intelligence division of the Internal Revenue Service in Jackson, and informed Hudson that Fisher was going to leave the country with a large sum of money, approximately $250,000 to $500,000, and that Fisher would probably not return.
Local law enforcement officers and the FBI were notified of Duke's plan to have Fisher killed. John W. Bonino, an agent of the FBI office in Jackson was selected to pose as a hitman and collect the money for the killing. Bonino posed as a hitman using the name "Mickey" and met Duke to collect the $15,000. Duke wanted assurance that Fisher was dead and Bonino showed Duke a distinctive ring that Fisher wore. After seeing the ring Duke said he was satisfied. Duke expressed concern over the possible discovery of Fisher's body and explained that he meant, "Not an arm, not a leg" should ever be discovered. Duke told Bonino that his alibi was based on the premise that Fisher's body would not be discovered.
Duke told Bonino that Fisher had been having tax problems and that an IRS agent told him he would not be surprised if Fisher left the country. Duke told Bonino that, with Fisher out of the way, he could arrange *729 the company books so that he, Duke, stood to gain $150,000. Duke paid Bonino $11,500 and told him that he assumed that he had taken approximately $1300 off of Fisher's person and the $11,500 would complete the payment. Bonino made it clear that he expected the additional $1,000. The $2500 difference was to be paid to Samuelson for arranging the killing.
Payment of the money by Duke to Bonino was observed by several people and Duke admitted paying the agent the money but claimed that he was cooperating with an FBI agent, James W. Ratliff, to aid in an investigation against Fisher. Duke had testified on behalf of the United States in a trial involving one Leo Hall on a charge of counterfeiting. Duke said that he was reluctant to go along with the idea but Ratliff guaranteed immunity. He stated that Ratliff talked with him on Monday before his, Duke's, arrest and the payoff was not originally a part of the plan but Ratliff came up with the idea of the payoff to the hitman stating that it would make the plot more believable. He admitted meeting with Bonino and paying the $11,500 but was unsure whether Bonino was posing as a hitman or whether he actually was someone from the underworld. He stated that he was concerned and upset but ascertained by skillful questioning that Mickey was a government agent rather than a genuine hitman. He claims he made it clear to Bonino that he knew Bonino was an FBI agent. He said when he was arrested Bonino was in the car and he felt relieved that Bonino was actually an FBI agent.
An agent from the FBI stated that personnel files of the FBI showed that the FBI had no employee by the name of James W. Ratliff or Radcliff or any variation of the name.
Duke contends that the evidence for the state constituted at most proof of solicitation or preparation and that he only planned a crime. He argues strenuously that the state's proof did not show that he committed any overt acts toward having Fisher murdered. He therefore concluded that he was entitled to a peremptory instruction, and if not entitled to a peremptory instruction, then the verdict of the jury was against the overwhelming weight of the evidence.
One of the leading cases in the United States on attempt to commit a crime is Stokes v. State, 92 Miss. 415, 46 So. 627, 21 L.R.A., N.S., 898 (1908). In Stokes this Court recognized the difficulty of reconciling authorities on the subject of the acts necessary to constitute an attempt to commit a crime. The Court stated:
It is useless to undertake to reconcile the authorities on the subject of what constitutes an attempt, or what is an overt act, within the meaning of the section in question. It is equally impossible for us to undertake to lay down any rule on this subject which would serve as a guide in all future cases. To a very great extent each and every case must stand on its own facts. The text-books and decisions are noted for their lack of harmony. It is impossible to decide any case on this subject without doing violence to some author or some adjudicated case. Therefore all we can hope to do is to follow the best authorities and to clear up the subject as best we can, so far as the laws of this state are concerned. (92 Miss. at 424, 425, 46 So. at 628).
Before Stokes, this Court recognized the complexity of the legal questions involved in the charge of attempting to commit a crime in Cunningham v. State, 49 Miss. 685 (1874):
This doctrine of attempt to commit a substantive crime is one of the most important, and at the same time most intricate, titles of the criminal law. It is truly remarked by Mr. Bishop, in his valuable work on criminal law, that there is no title, indeed, less understood by the courts, or more obscure in the text books, than that of attempts. There must be an attempt to commit a crime, and an act toward its consummation. So long as an act rests in bare intention, it is not punishable; but, immediately when an act is done, the law judges not only of the act done, but of the intent with which it was *730 done; and if accompanied with an unlawful and malicious intent, though the act itself would otherwise have been innocent, the intent being criminal, the act becomes criminal and punishable. (49 Miss. at 701).
In Stokes, we concluded:
When the intent to commit crime exists, or, to put it more accurately, when the only proof is that it is merely the declared intention of a person to commit a crime, with no act done in furtherance of the intent, however clearly may be proved this intention, it does not amount to an attempt, and it cannot be punished as such. But, whenever the design of a person to commit crime is clearly shown, slight acts done in furtherance of this design will constitute an attempt, and this court will not destroy the practical and commonsense administration of the law with subtleties as to what constitutes preparation and what an act done toward the commission of a crime. Too many subtle distinctions have been drawn along these lines for practical purposes. Too many loopholes have been made whereby parties are enabled to escape punishment for that which is known to be criminal in its worst sense. (92 Miss. at 427, 428, 46 So. at 629).
The proof is overwhelming that Duke intended to kill Fisher and that he performed more than slight acts in furtherance of his design. The jury rejected his defense that all acts committed by him were in cooperation with the FBI. Duke's acts in this case went far beyond mere preparation or planning because he solicited Samuelson to kill Fisher, arranged a hunting trip for that purpose, and following the failure to kill Fisher during the November hunting trip, he again solicited Samuelson to find a hitman, agreed to pay $15,000 to have Fisher killed, and actually paid $11,500 to a person whom he believed had killed Fisher. This is a strong case and we fail to see where a fair minded jury could have returned any verdict except that of guilty.
In Cunningham the Court defined an overt act as one which manifests the intention to commit the crime. It would be difficult to find a stronger case than one presented against Duke. The evidence shows that Duke did everything he could to carry out his intent to have Fisher killed. He set the plan in motion, he laid an alibi, he believed Fisher had been killed and paid the feigned assassin. Duke urges that these activities were mere solicitation or preparation and further submits that there was no possibility of the crime being committed; thus, he contends as a matter of law, that no crime was committed. Stokes clearly established the proposition that when the impossibility grows out of extraneous facts not within control of the party, impossibility is not a defense.
Duke also argues that proof of the hunting incident and his earlier solicitation of Samuelson to eliminate Fisher should not have been admitted because these facts were evidence of other crimes. Ordinarily in a criminal case the issue is single, but all of the state's proof in this case established the intent of Duke to kill Fisher and showed overt acts committed by Duke to carry out this intent.
Following the payment of money to Bonino by Duke, Duke was arrested on a federal charge. The complaint charged him with violating U.S.C. Title 18 Section 875(c) and is in the following language:
Glenn Duke did willfully and knowingly transmit in interstate commerce from Jackson, State of Mississippi, to the State of Texas a telephone communication to Robert Samuelson, which telephone communication contained a threat to injure the person of Billy E. Fisher, that is that Duke agreed to pay the sum of $15,000.00 to have Fisher killed.
The complaint further states:
And the complainant states that this complaint is based on personal contact and interstate telephone conversations between Duke and Samuelson occurring in January, 1975, between Jackson, Mississippi and Fort Worth, Texas, during which contacts and telephone conversations Duke offered and agreed to pay *731 $15,000.00 to whomever Samuelson procured to kill Fisher; and payment of $11,500.00 on February 3, 1975, by Duke to John W. Bonino for purportedly carrying out the threat to kill Fisher.
John McGirl, an FBI special agent, testified that he and other officers arrested Duke on the federal charge, gave the Miranda warning and placed Duke in the custody of the United States Marshal. Shortly after Duke's arrest McGirl received a call from Special Agent Sammon that Duke had a book that he wanted to give to the FBI. McGirl returned to his office where he found Duke in custody of Deputy U.S. Marshals and Duke requested McGirl to drive him to his home to obtain the book. McGirl again gave Duke Miranda warnings on the trip to Duke's home and testified as follows:
While we were riding, after Mr. Duke advised me to the fact that he had this book which he desired to give to the F.B.I., he stated he also had information about the crooks in the Jackson, Mississippi, area. He stated that he would like for the F.B.I. to know all about it.
At this point, it was my opinion that he might be furnishing some information that might be incriminating to him in the case that was presently at hand. So, at that time I advised him again of his rights, that he didn't have to make any statements to me, and that any statements made by him could be used in a court of law.
Mr. Duke stated he knew this. However, he stated, he was guilty of the charges that had been made against him, but that be felt that the information he had concerning 
BY MR. STRATTON:
Your Honor. The only charges that had been leveled against him at this time were the U.S. charges, the federal charge, and in view of this testimony we want to move for a mistrial, because this is damaging, it's not pertinent to the issue at hand, and it relates to the charges made by the federal authorities.
The book was introduced into evidence as Exhibit 7 and McGirl stated that he felt that it was not useful in the investigation they were presently conducting. Duke told McGirl he kept the book so that if he were ever investigated by the Internal Revenue Service he would have the book to show what monies he had paid out for the Mobile Home business that he was then operating.
Duke renewed his motion for mistrial and the motion was overruled. Following this his attorney made the following motion:
The motion having been overruled, we would like to exclude all of the testimony of this witness, McGirl, except the introduction of State's Exhibit `7', and that the jury be instructed to disregard any alleged confession as to any court violations, or any other violations, and any other testimony by this witness.
BY THE COURT: (To the jury)
All right. Ladies and gentlemen, you are so instructed to disregard all of the testimony of this witness, with the exception of that relating to this book.
Do you understand?
The jurors nodded their heads in the affirmative to show they understood that they were to disregard all of the testimony of McGirl with the exception of that related to the book. On request of Duke's counsel, the court polled each juror individually on the question.
The court properly admonished the jury. We have held in many cases that when an objection to testimony is sustained and the jury is admonished to disregard it there is no reversible error. Herron v. State, 287 So.2d 759 (Miss. 1974).
In Holifield v. State, 275 So.2d 851 (Miss. 1973) we held that when the court sustains an objection to improper testimony or improper remarks of counsel participating in the trial, it is presumed, unless otherwise shown, that the jury followed the directions of the trial judge to disregard such comment or testimony.
We hold that no error was committed by the court in refusing the mistrial because he properly admonished the jury. We also *732 hold that there was no error because the evidence of Duke's admission of guilt was admissible. Obviously he was referring to the federal charge which was so closely connected to the state charge later filed that it constituted an admission against interest.
Duke also argues that the demurrer to the indictment was erroneously overruled. The claimed error was not preserved for review. If we reached the question of the demurrer to the indictment, we would hold that the indictment is sufficient. Ford v. State, 218 So.2d 731 (Miss. 1969).
AFFIRMED.
GILLESPIE, C.J., INZER, P.J., and SMITH, ROBERTSON, WALKER, BROOM and LEE, JJ., concur.
PATTERSON, P.J., took no part.