# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-KA-00364-COA

**SHAMEKA L. HALL A/K/A SHAMEKA LATRICE HALL A/K/A SHAMEKA HALL A/K/A SHAMEKIA LATRICE HALL**　　　　　**APPELLANT**

v.

**STATE OF MISSISSIPPI**　　　　　**APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 02/05/2024 |
| TRIAL JUDGE: | HON. ROBERT B. HELFRICH |
| COURT FROM WHICH APPEALED: | FORREST COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: JULIANNE KAY BAILEY |
| DISTRICT ATTORNEY: | PATRICIA A. THOMAS BURCHELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 10/07/2025 |
| MOTION FOR REHEARING FILED: | |

**BEFORE WILSON, P.J., LAWRENCE AND McCARTY, JJ.**

**WILSON, P.J., FOR THE COURT:**

¶1.　Following a jury trial, Shameka Hall was convicted of attempted capital murder for agreeing to pay her stepbrother to kill her ex-boyfriend's new girlfriend.  On appeal, Hall argues that the evidence is insufficient to support her conviction and that the jury's verdict is contrary to the weight of the evidence. Finding no error, we affirm.

## STATEMENT OF FACTS

¶2.　In October 2022, Hall texted her stepbrother, Bernardo Loftin, that she "need[ed] to discuss something with [him] ASAP."  On November 4, Hall and Loftin met, and Hall asked

Loftin to kill Ariunna Myers, who was in a relationship with Hall's ex-boyfriend, Donnell Wright. In the days that followed, Hall and Loftin continued to exchange text messages regarding the plan. Loftin became worried that he was being "set up," so he decided to tell his probation officer about his conversations with Hall. The probation officer put Loftin in contact with detectives at the Hattiesburg Police Department (HPD).

¶3. The detectives asked Loftin to secretly record his conversations with Hall, and Loftin agreed. Loftin arranged to meet Hall on her lunch break, and they drove around in Loftin's car discussing the murder. Loftin used a hidden camera the detectives had given him to record the conversation. Hall reiterated that she wanted Loftin to kill Myers. Hall and Loftin agreed on a price of $2,000 with a down payment of $200. Hall also agreed to provide Loftin with a gun to commit the murder. As Loftin was driving Hall back to work, HPD officers stopped the car and arrested Hall. A Forrest County grand jury indicted Hall for attempted capital murder. *See* Miss. Code Ann. §§ 97-1-7(2) & 97-3-19(2)(d) (Rev. 2020).

¶4. Loftin testified for the State at trial. Loftin said he and Hall had "a relationship" but were raised in separate homes and were "not close." In October 2022, Loftin received a text message from a number he did not recognize. Loftin asked who sent the message, and the sender responded, "ur sister." The next day, the sender stated, "I need to discuss something with you ASAP." Loftin realized that Hall was texting him, and they agreed to meet a few days later at a gas station. When they met, Hall told Loftin that she wanted to kill Myers.

¶5. Loftin testified that Hall initially "wanted [him] to teach her how to kill [Myers]." Hall said she wanted "to be there when it was done" and watch Myers die. Hall told Loftin

2

that Myers had "caused enough problems," that she needed Myers "out of her life," and that "[s]he want[ed] [Wright] back." Hall told Loftin not to hurt Wright or his children. For the next several days, Hall "consistently" and "persistently" called and texted Loftin about killing Myers. On November 14, Loftin sent Hall a text message that stated, "It is a price doing that work on that house gonna be completed but it's going to be complicated so the estimate is around &2000 I got all the material and I'll have it ready before thanksgiving." Two days later, Hall sent Loftin a text that stated, "I need that house fix ASAP I ready to move in." Hall added, "I will help u fix it." Loftin responded that he would "do the work for [Hall]" and did not "mind the help"; but it was "serious work," and she had "to promise to pay [him] afterwards." Loftin also asked Hall if she "ha[d] the tools to do the work" because he did not "have the tools [he would] need." Loftin testified that these text messages were all "code" for their murder plot.

¶6.     Loftin met with Hall again to discuss their plan, but he became suspicious that he was being "set up." He decided it was in his "best interest" to tell his probation officer about Hall's plans and request. Loftin's probation officer put him in contact with HPD detectives Jeremy Dunaway and Chadra Daniels. Loftin showed the detectives the text messages between him and Hall, and they asked Loftin to "wear a wire" the next time he met with Hall. Loftin agreed, and the detectives gave him a hidden camera to use. On November 18, 2022, Loftin picked Hall up at her place of work during her lunch break. They drove around Hattiesburg while discussing "the hit" while Loftin secretly recorded their conversation. The video recording was played for the jury at trial.

3

¶7.    In the video, Hall stated that she had created a fake Facebook account to track Myers and her location. Hall stated that Myers was at a hotel in Kansas City. Loftin observed that Hall seemed "serious about" the hit, and Hall replied, "[H]ell yeah, get rid of that motherf***er" because the "bitch [was] causing [her] problems." Loftin said he would kill Myers for $2,000 with a $500 down payment, which he later agreed to reduce to $200. Hall said her "sugar daddy" would help her get the money. Hall wanted to be sure that the murder could not be traced back to her or Loftin. She told Loftin that she would "get [a gun] from her uncle" because her uncle had many guns and would not notice if one was missing. Hall and Loftin discussed traveling to Kansas City to kill Myers but eventually decided that Loftin would kill her after she returned to Mississippi. Hall knew that Myers had a court date in Mississippi on November 30, and Hall insisted that she wanted Myers killed by that date. Hall said she did not care how Loftin committed the murder or disposed of the body. She told Loftin where Wright and Myers lived, described where cameras were located on the property, and advised Loftin on how to avoid the cameras. Loftin and Hall discussed the murder plot for about fifteen minutes before Loftin drove Hall back toward work. HPD officers pulled Loftin over for failing to stop at a stop sign, and they arrested Hall.

¶8.    Loftin testified he believed Hall was serious about the murder because they had "a relationship," and she specifically called him to do the job. He agreed that $2,000 was "a little low" for a murder. No money ever changed hands between Hall and Loftin. Loftin acknowledged he had been convicted of armed robbery and murder. He also testified that he had been hired to kill people in the past. When he was asked "why people come to [him]

4

to have other people killed," Loftin responded, "I would do it . . . . I have done it." Loftin analogized, "You call a plumber when you want some plumbing fixed. You call a mechanic when you want your car fixed . . . ." At the time of trial, Loftin was in federal prison for violating his probation by possessing a firearm. Loftin testified that he "told [the HPD detectives], word for word, [that he did] not need [their] help with [an unspecified] murder charge in Jeff Davis County."

¶9.    Manessa Decker managed an apartment complex where Hall previously lived. Decker testified that when she had approved Myers's application to move into the complex, there was "an altercation" between Hall and Myers. Hall told Decker that "she was going to kill Ms. Myers, and the blood was going to be on [Decker's] hands." Myers ultimately decided not to move in.

¶10.    After Hall was arrested, Detective Daniels obtained a warrant to search her phone. Daniels learned that Hall had texted Loftin via Sideline, an app that hides the user's primary phone number and shows a second phone number. Daniels was aware that Hall and Myers had filed several police reports against each other related to their respective relationships with Wright. Daniels testified that she investigated the information Loftin provided and took Hall's threats seriously because she believed that Hall "ha[d] the means and the capability of making a murder for hire take place."

¶11.    At the close of the State's case-in-chief, Hall moved for a directed verdict, which the trial court denied.

¶12.    Donnell Wright testified for the defense. He stated he had been in "a committed

relationship" with Hall for about thirteen years. Sometime in 2021, Wright met Myers, who was twenty-three years younger than him and twenty years younger than Hall. Wright said Myers was "just a friend," but he acknowledged they were having sex. Wright knew that his relationship with Myers hurt Hall and negatively affected Hall's mental state, so sometime in 2022, he took Hall on vacation to try "to get everything squared away." He and Hall discussed "trying to get back together" and possibly getting married, but later they "moved away from each other" again. Eventually, Myers moved in with Wright, and he "could see that [Hall] was hurt." When Hall was evicted from her apartment and needed a place to stay, Wright could not help her because Myers was living with him. Wright felt bad because Hall had once "opened her door for" him when he had been "homeless," but he "couldn't return that favor to her." He could tell that Hall was "hurt" by his unwillingness to help.

¶13. Wright had watched the video of Hall hiring Loftin to kill Myers. Wright thought Hall sounded "very different" in the video from "the Shameka [he] kn[e]w." Wright said Hall "will just talk," "but she will never act on it." He said there had "been plenty of times when [he] had to calm [Hall] down because she [was angry and] wanted to go do stuff." "And after a few hours," Hall would "think about it" and "calm down." Wright said he had "never seen [Hall] like she [was] in the video." Wright knew that Hall was having financial problems, did not have a steady place to live, and was behind on her car note. He did not believe that Hall actually had a "sugar daddy" because she was still "stuck on" him. On cross-examination, Wright was asked whether he had witnessed Hall try to run over Myers with a vehicle. Wright said he did not witness the event because he "was still in his vehicle,"

6

and Myers "was standing in the road."

¶14.    Hall testified in her own defense.  Hall claimed that when she exchanged text messages with Loftin, she was actually trying to hire him to make repairs to a house and that the messages had nothing to do with a "hit."  She stated that she needed somewhere to stay, that she learned her stepmother had an empty house, and that she agreed to pay Loftin $2,000 to fix up the house so she could live in it.

¶15.    Hall testified that during her recorded conversation with Loftin just prior to her arrest, she "had a mental break," but she "was not going to hurt anybody."  She stated that she was stressed because she "was homeless," "didn't have any money," and "was trying to work overtime to get money so [she] could move into the house."  She said she "was not going to hurt anybody because [she] didn't have the means or the fund[s]."  She testified that she wanted Myers "out of Mr. Wright's life but not . . . dead."  Hall characterized her statements to Loftin as "just talk," and she denied telling Decker she would kill Myers.  Hall also stated that she used her fake Facebook account to keep tabs on Wright, not Myers.  She stated she did not have a "sugar daddy" who could have given her money or an uncle who owned numerous guns.  She maintained that she could never have hired Loftin to kill Myers because she had no money to pay him.

¶16.    The jury found Hall guilty of attempted capital murder.  The court sentenced her to forty years in the custody of the Department of Corrections with twenty-five years to serve, fifteen years suspended, and five years of post-release supervision.  Hall filed a motion for judgment notwithstanding the verdict or a new trial, which was denied, and a notice of

appeal. On appeal, Hall argues that the evidence is insufficient to support her conviction for attempted capital murder or, in the alternative, that she is entitled to a new trial because the jury's verdict is contrary to the overwhelming weight of the evidence.

**ANALYSIS**

¶17.    We review a challenge to the sufficiency of the evidence de novo. *Haynes v. State*, 250 So. 3d 1241, 1244 (¶6) (Miss. 2018). "[W]e view the evidence in the light most favorable to the State and decide if rational jurors could have found the State proved each element of the crime." *Lenoir v. State*, 222 So. 3d 273, 279 (¶25) (Miss. 2017). "We are not required to decide—*and in fact we must refrain from deciding*—whether *we think* the State proved the elements." *Id.* (quoting *Poole v. State*, 46 So. 3d 290, 293-94 (¶20) (Miss. 2010)). "Rather, we must decide whether a reasonable juror could rationally say that the State did." *Id.* (quoting *Poole*, 46 So. 3d at 294 (¶20)).

¶18.    Hall was indicted for attempted capital murder under Mississippi Code Annotated sections 97-1-7(2) and 97-3-19(2)(d). Section 97-1-7(2) provides that "[e]very person who shall design and endeavor to commit an act which, if accomplished, would constitute an offense of murder under Section 97-3-19, but shall fail therein, or shall be prevented from committing the same, shall be guilty of attempted murder[.]" Section 97-3-19(2)(d) provides that "[t]he killing of a human being without the authority of law by any means or in any manner shall be capital murder" when it is "perpetrated by any person who has been offered or has received anything of value for committing the murder[.]" In addition, "all parties to such a murder[] are guilty as principals." *Id.*

¶19.    Hall argues that the State presented insufficient evidence to support her conviction because the evidence showed only "planning" or a "possible design" to commit murder. She argues that the State failed to prove any "endeavor" or "overt act" that, "if accomplished, would constitute the offense of capital murder." (Brackets omitted). She argues that the State, at most, showed evidence of plans or possibly a conspiracy—a distinct crime not charged in the indictment—and not an attempted murder. She argues that an agreement on a price for a murder for hire is not an attempt to commit the murder.

¶20.    As an initial matter, it is important to note that the attempted murder statute does not require proof of an *overt* act. As the Mississippi Supreme Court has explained,

> [i]n 2013, the Legislature amended the attempt statute by adding the language found in subsection (2), which only addresses attempted murder. The Legislature specifically set apart attempted murder from all other attempt crimes by removing the overt act requirement as to attempted murder. . . . In subsection (2), . . . the Legislature definitively wrote that only "an act" be committed in furtherance of the murder. . . .
>
> [P]rior to 2013, all attempt crimes were treated the same under the general statute, and that general statute required proof of an "overt act." A plain reading of the amended statute, however, leaves no question that the Legislature chose to treat the crime of attempted murder differently from all other attempt crimes, by removing from the text the "overt act" language in Section 97-1-7(2), which singularly addresses attempted murder.

*Beale v. State*, 367 So. 3d 159, 162 (¶4) (Miss. 2023) (citations and footnote omitted), *cert. denied*, 144 S. Ct. 245 (2023).

¶21.    Therefore, under the statute, the State was required to prove that Hall "design[ed] and endeavor[ed] to commit *an act* which, if accomplished, would constitute an offense of [capital] murder," Miss. Code Ann. § 97-1-7(2) (emphasis added), to wit: having Myers

9

killed by offering Loftin something of value to commit the murder, Miss. Code Ann. § 97-3-19(2)(d). In addition, the State was required to show that Hall failed or was prevented from committing the murder. Miss. Code Ann. § 97-1-7(2).[1]

¶22.    The Mississippi Supreme Court's decision in *Stokes v. State*, 92 Miss. 415, 46 So. 627 (1908), is instructive. In *Stokes*, Cora Lane and Will Stokes were indicted for the attempted murder of Cora's husband, Wallace Lane. *Id.* at 423, 46 So. at 628. Stokes "undertook to hire one Shorty Robertson to do the killing." *Id.* Stokes agreed to pay Robertson $1,000, including $600 cash and $400 after the murder was committed, and Robertson agreed to commit the murder "on a certain night" when Wallace was expected to "be coming home from a lodge meeting." *Id.* However, Robertson instead reported Stokes's offer to law enforcement. *Id.* On the night they had planned to murder Wallace, Stokes and Robertson went "to lie in wait for the purpose of killing [Wallace]." *Id.* Stokes had obtained a gun for Robertson and accompanied Robertson to the planned location for the murder. *Id.* "[J]ust as Stokes was in the act of handing the gun to Robertson," Stokes was arrested by officers who were there waiting for them. *Id.* There was no evidence that "any money was ever paid to Robertson as promised" or that Wallace actually "came by the place where the killing was to occur on the night in question." *Id.* at 424, 46 So. at 628. On these facts, Stokes was tried

---

[1] We note that Hall's indictment did allege "an overt act." The term "overt" was surplusage since it is not included in the attempted murder statute. In addition, the term was carried forward to the jury instructions, which required the jury to find an "overt act." The inclusion of the term in the jury instructions was favorable to Hall in that the jury could have acquitted her if it failed to find an "overt act." However, we evaluate a challenge to the legal sufficiency of the evidence based on the essential elements of the charged offense, not surplusage included in an indictment or a jury instruction. *Esters v. State*, 281 So. 3d 844, 847-48 (¶9) & n.2 (Miss. Ct. App. 2019), *cert. denied*, 276 So. 3d 659 (Miss. 2019).

and convicted of attempted murder. *Id.*

¶23.    On appeal, Stokes argued that the evidence showed only "mere preparation" and no "overt act towards the commission" of the murder, as required under the general attempt statute. *Id.* at 424-26, 46 So. at 628-29.  The Supreme Court stated that it would be "useless to undertake to reconcile the authorities on the subject of what constitutes an attempt, or what is an overt act, within the meaning of the [statute]"—and "equally impossible" "to lay down any rule" that could "serve as a guide in all future cases." *Id.* at 424-25, 46 So. at 628. Rather, the Court stated that "[t]o a very great extent each and every case must stand on its own facts." *Id.* at 425, 46 So. at 628.  The Court noted that "[i]n many states it is held that the mere solicitation of a person to commit a crime is in itself an attempt, whether the person solicited agree to commit the crime or not." *Id.* at 426, 46 So. at 629.  But it was unnecessary for the Court to "decide [that] question" in *Stokes* since Stokes had "progressed beyond mere solicitation." *Id.*  The Court held that the record "fully warrant[ed] the conclusion that there was an act done towards the commission of the crime, within the meaning and purpose of the law, and for the peace and protection of society." *Id.*  The Court reasoned that

> when the only proof is that it is the declared intention of a person to commit a crime merely, with no act done in furtherance of the intent, however clearly may be proved this intention, it does not amount to an attempt, and it cannot be punished as such. *But, whenever the design of a person to commit crime is clearly shown, slight acts done in furtherance of this design will constitute an attempt*, and this court will not destroy the practical and commonsense administration of the law with subtleties as to what constitutes preparation and what an act done toward the commission of a crime.  Too many subtle distinctions have been drawn along these lines for practical purposes.  Too many loopholes have been made whereby parties are enabled to escape punishment for that which is known to be criminal in its worst sense.

11

*Id.* at 427-28, 46 So. at 629 (emphasis added).

¶24. *Stokes* is recognized as "one of the leading cases in the United States on attempt to commit a crime." *People v. Decker*, 157 P.3d 1017, 1023 (Cal. 2007) (brackets omitted) (quoting *Duke v. State*, 340 So. 2d 727, 729 (Miss. 1976)) (adopting *Stokes*'s "slight-acts rule"). In *Duke*, our Supreme Court quoted and reaffirmed this reasoning from *Stokes*. *Duke*, 340 So. 2d at 730 (affirming an attempted murder conviction because "[t]he proof [was] overwhelming that [the defendant] intended to kill . . . and performed more than slight acts in furtherance of his design"). More recently, the Court reiterated that "[i]t is the law of this State that the intent to commit a crime *plus any slight act toward its consummation* is sufficient in law to constitute the commission of an attempted crime." *Brady v. State*, 337 So. 3d 218, 224 (¶11) (Miss. 2022) (emphasis added) (quotation marks omitted).

¶25. *Stokes* obviously involved more substantial acts toward the commission of the murder than the present case. Stokes actually obtained a gun and accompanied the hired killer to the planned site of the murder—although, just as in this case, there was no evidence that Stokes actually paid the hired killer any money. *See Stokes*, 92 Miss. at 423-24, 46 So. at 628. *Stokes* is also distinguishable in that Stokes was convicted under the general attempt statute, which requires proof of an "overt act," whereas Hall was convicted under the attempted murder statute, which does not. *See Beale*, 367 So. 3d at 162 (¶4).

¶26. However, we conclude that the evidence presented at trial was sufficient under *Stokes*'s "slight-acts rule" to sustain Hall's conviction. *Stokes* holds that "whenever the design of a person to commit crime is clearly shown, slight acts done in furtherance of this

12

design will constitute an attempt." *Stokes*, 92 Miss. at 427, 46 So. at 629. Here, Hall's "design" to murder Myers was clearly shown. Hall sought out her stepbrother for the sole purpose of killing Myers. Loftin had been convicted of murder and apparently had a reputation as a killer for hire. Over a period of weeks, Hall remained adamant and insistent that she wanted Loftin to kill Myers—to the point that Loftin began to suspect that *he* was being "set up." In the video played for the jury, when Loftin observed that Hall seemed "serious about" the hit, Hall replied, "[H]ell yeah, get rid of that motherf***er." Hall and Loftin discussed a plan to kill Myers in Kansas City before eventually settling on a plan to kill her after she returned to Mississippi. But Hall remained adamant that Loftin needed to kill Myers by November 30. On this evidence, a rational jury could surely find that Hall had a design to kill Myers.

¶27. A rational jury could also find that Hall committed "slights acts . . . in furtherance of [her] design." *Id.* Hall agreed to pay Loftin $2,000 to kill Myers. Hall also agreed to provide Loftin with a gun to commit the murder. Hall also advised Loftin on how to commit the murder, warning him about the presence and location of cameras at Wright's home. *See Burnett v. State*, 231 So. 3d 1001, 1004 (¶2) (Miss. Ct. App. 2017) (defendant convicted of the attempted murder of his wife and stepdaughter after he gave the hired killer "a map to his house," "descriptions of his wife and stepdaughter's schedules and sleeping arrangements," and "other information that would be of use . . . in finding and killing them").

¶28. Under the attempted murder statute, Hall's agreement to pay Loftin to commit the murder, her agreement to provide Loftin with a murder weapon, and her assistance to him

13

are acts that "if accomplished, would constitute an offense of [capital] murder," i.e., murder for hire. Miss. Code Ann. § 97-1-7(2). In addition, Hall did not abandon her attempt. Rather, under the statute, she was "prevented from committing" capital murder only because Loftin became suspicious that he was being set up and decided to report Hall rather than carry out the murder. *Id.* Because Hall's "design" to commit the murder was "clearly shown," and because she committed "slight acts . . . in furtherance of [her] design," there is sufficient evidence to sustain Hall's conviction. *Stokes*, 92 Miss. at 427, 46 So. at 629. Hall cannot "escape punishment" by arguing "subtleties as to what constitutes preparation and what an act done toward the commission of a crime." *Id.* Whether Hall's acts had passed the stage of planning and preparation and reached the point of an attempt was a question of fact that the trial court properly submitted to the jury. *See id.* at 425, 46 So. at 628 ("To a very great extent each and every case must stand on its own facts.").

¶29. Hall also argues, in the alternative, that she is entitled to a new trial because the jury's verdict is against the overwhelming weight of the evidence. For challenges to the weight of the evidence, we "view the evidence in the light most favorable to the verdict and disturb the verdict only when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Little v. State*, 233 So. 3d 288, 289 (¶1) (Miss. 2017). "We do not reweigh evidence. We do not reassess the witnesses' credibility. And we do not resolve conflicts between evidence. Those decisions belong solely to the jury." *Id.* In addition, we "review the trial court's decision to grant or deny a new trial for an abuse of discretion." *Id.* at 292 (¶21).

14

¶30. Based on the same evidence discussed above, the jury's verdict was not against the overwhelming weight of the evidence. The State presented ample evidence of Hall's guilt through the recording of Hall agreeing to pay Loftin to commit the murder, Loftin's testimony, and other evidence. The only significant contrary evidence was Hall's own testimony. Hall's testimony and credibility were for the jury to weigh and assess. Hall's testimony did not overwhelm the proof of her guilt. Therefore, we cannot say that the trial judge abused his discretion by denying Hall's motion for a new trial.

¶31. **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., WESTBROOKS, McDONALD, LAWRENCE, McCARTY, EMFINGER, WEDDLE AND LASSITTER ST. PÉ, JJ., CONCUR.**